Honorable George H. BOLDT, Individually, and as Chairman of the Pay Board, Defendant-Appellant,

v.

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW) and International Association of Machinists and Aerospace Workers (IAMAW), AFL–CIO, Plaintiffs-Appellees.

No. DC–3.

Temporary Emergency Court of Appeals.

June 21, 1973.

William C. White, Atty., U. S. Dept. of Justice, Washington, D. C., for defendant-appellant.

Stephen I. Schlossberg, Gen. Counsel, International Union, UAW, Detroit, Mich., and Plato E. Papps, Washington, D. C., Atty., for International Association of Machinists and Aerospace Workers, AFL–CIO, for plaintiffs-appellees.

Before TAMM, Chief Judge, and HASTIE and JOHNSON, Judges.

JOHNSON, Judge.

This is an appeal from the District Court's grant of summary judgment in favor of the appellee unions. The court below held that certain agreements between the International Association of Machinists and Aerospace Workers (IAM) and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) and various aerospace companies are contracts executed prior to August 15, 1971, within the meaning of Section 203(c)(1) of the Economic Stabilization Act Amendments of 1971 (hereinafter the Act).[1] We affirm.

In 1968, the UAW entered into three-year collective bargaining agreements, scheduled to expire in the Fall of 1971, with McDonnell Douglas Corporation, LTV Aerospace Corporation and North American Rockwell Corporation. Besides providing for periodic increases in wages, each of these contracts contained a cost of living adjustment, referred to by the parties as COLA, clause which allowed for additional adjustments in the hourly wage rate to reflect changes in the cost of living as measured by the Bureau of Labor Statistics Consumer

---

1. § 203(c)(1)—The authority conferred on the President by this section shall not be exercised to limit the level of any wage or salary (including any insurance. or other fringe benefit offered in connection with an employment contract) scheduled to take effect after November 13, 1971 to a level below that which has been agreed to in a contract which (A) related to such wage or salary, and (B) was executed prior to August 15, 1971, unless the President determines that the increase provided in such contract is unreasonably inconsistent with the standards for wage and salary increases published under subsection (b).

   P.L. No. 92–210, § 2 (Dec. 22, 1971).

   August 15, 1971, marked the beginning of the 90-day freeze on all wages, salaries, rents and prices, ordered by the President under the authorization of the Economic Stabilization Act of 1970, P.L. No. 91–379 (Aug. 15, 1970) and referred to as Phase I of the economic stabilization program. November 14, 1971, was the beginning of Phase II of the program, during which strict wage-price controls were in effect. Section 203(c) was passed to meet the problem of deferred wage increases that were affected by the imposition of these wage-price controls. While it was clear that the automatic granting of all deferred wage increases would severely undermine the objectives of the stabilization program, it was also thought inequitable to wage earners to treat anticipated deferred increases in the same manner as new wage increases scheduled after the controls took effect. See text accompanying notes 12 and 13, infra.

Price Index (CPI). Each such clause contained what is referred to as a "cap", or a provision which limited the COLA increase allowable to eight cents per hour per man in each of the last two years of the agreements irrespective of the changes in the CPI. Shortly after execution of the master contracts in 1968, the UAW and each company signed certain letters purporting to confirm COLA "overage" agreements between the parties. A COLA overage agreement provides for a "catch-up" in wages or other benefits at the end of the term of a collective bargaining agreement by removal of the limitation imposed by the "cap". The overage agreements described in the letters provided in each case that wages and other benefits were to be increased to the extent that the COLA adjustment previously allowed was less than what would have been allowed if an increase of one cent for each 0.4 point change in the CPI had been permitted during the three-year term of the collective bargaining agreement without regard to the cap.[2] The increase in wages attributable to the overage agreements was to "be available" as of certain specified dates in September and October, 1971, "for wages and/or other benefits as may be agreed upon by the Company and the Union in the collective bargaining agreement next succeeding the 1968 Agreement."[3] The amount of the overage, subsequently calculated, was 34 cents per hour. In December 1971, the UAW and the respective aerospace companies entered into a new collective bargaining agreement which provided for a wage increase of approximately 51 cents per man per hour, of which 34 cents was attributable to the COLA overage adjustment, the remaining approximately 17 cents being a general wage increase.

In 1968, the IAM entered into a three-year collective bargaining agreement, scheduled to expire July 23, 1971, with three divisions of Lockheed Aircraft Corporation. This contract contained the same COLA agreement as the UAW contracts, with the same cap, but with no overage provision. The affidavit of Floyd E. Smith, President of the IAM, states that on July 14, 1971, after negotiations, the parties reached an agreement that COLA adjustments would be retroactive to July 23, 1971, and would follow the industry pattern— i. e., would be calculated in the manner specified in the UAW overage agreements. At the time, the COLA overage adjustment had already reached approximately 34 cents. This agreement was purportedly confirmed by letter from Lockheed dated July 19, 1971.[4] As con-

---

2. An overage agreement is advantageous to both parties. Since the overage takes effect only toward the end of the term of the collective bargaining agreement, the employer benefits because a ceiling is placed on potential out-of-pocket costs, or cash outlay, during most of the life of the contract. The company is, therefore, more willing to agree to the total COLA increase. The union is satisfied since workers obtain a present right to an overage benefit which will help offset the impact of inflation and since the union can begin subsequent negotiations with this amount already "in the package".

3. The relevant portion of the UAW-Douglas COLA overage letter reads as follows:
The parties agree that to the extent the Cost-of-Living Adjustment in effect on July 19, 1971, plus the one cent (1¢) that was diverted to the Dental Plan, is less than the allowance that would have been in effect at such time if the total

Cost-of-Living Adjustment increase during the term of the 1968 Agreement had been one cent (1¢) for each full 0.4 point change in the BLS Consumer Price Index from the average at the March, April and May, 1968 Indexes to the average of the March, April and May, 1971 Indexes, the difference in cents per hour will be available on September 16, 1971, retroactive to July 19, 1971, for wages and/or other benefits as may be agreed upon by the Company and the Union in the Collective Bargaining Agreement next succeeding the 1968 Agreement.
With the exception of the various dates listed, the LTV and North American Rockwell letters are substantially identical to the Douglas letter.

4. The relevant portion of the letter reads as follows:
At the joint LAC/IAM–AW meeting in San Francisco on July 14, 1971, the union

sideration, the union agreed to extend the terms of the expiring contract, including the no-strike clause. In December 1971, the IAM and Lockheed executed a new three-year collective bargaining agreement. Total wage increases provided for amounted to approximately 51 cents—34 cents residual COLA and approximately 17 cents general wage increase.

On December 21, 1971, the Pay Board conducted a hearing to review the new three-year agreements between the UAW and the IAM and their respective companies, and on January 5, 1972, issued a resolution disapproving the wage increases provided in those agreements as being unreasonably inconsistent with the purposes and objectives of the Economic Stabilization Act of 1970, as amended. The Board acted pursuant to Section 201.10 of its Regulations, which placed a ceiling of 5.5 percent on any wage increase payable under a contract entered into or modified on or after November 14, 1971.[5] The Pay Board considered the entire 51 cents per hour increase to be an increase payable pursu-

ant to a contract entered into after November 14, 1971, since the increase was included in the provisions of the new agreements signed in December 1971. This increase exceeded the allowable 5.5 percent.[6]

Section 203(c)(1) of the Act provides that any wage scheduled to take effect after November 13, 1971, cannot be limited to a level below that which was agreed to in a contract relating to the wage and executed prior to the freeze on wages and prices which began August 15, 1971, unless the President determines that the proposed increase is unreasonably inconsistent with the general standards of wage and salary increases published under the authority of the Act. At the time the Pay Board acted upon the UAW and IAM contracts in this case, the policy of the Board, as provided by regulation issued pursuant to Section 203(c)(1), was to allow all such deferred wages to be paid as scheduled, subject to review if challenged by a party in interest or by five or more members of the Pay Board.[7] The un-

---

asked for the Company's position and attitude toward certain major issues in the current collective bargaining negotiations between Calac, Gelas, and LMSC and their respective IAM–AW units. In response to the unions' request that the views stated by the Company in this meeting be expressed in writing, the attached statements have been prepared. We sincerely hope these will provide a basis for resolution of these issues in the negotiations being conducted at these respective divisions.

RETROACTIVITY

A. *Wages, Minimums and Maximums of Rate Ranges, Cost-of-Living Allowances, and Labor Grade Placements of Job Classifications*

Negotiated increases in wages and minimums and maximums of rate ranges, and changes in cost-of-living allowances, and in labor grade placements of job classifications shall be retroactive to the payroll period commencing on the next after July 23, 1971, the anniversary date of the current collective bargaining agreements.

5. The Regulation was issued November 13, 1971, 36 Fed.Reg. 21790, the last day of Phase I of the wage-price controls,

and slightly modified on December 27, 1971, 35 Fed.Reg. 25427. At the time the Board made its decision, the Regulation read in relevant part as follows:

Effective on and after November 14, 1971, the general wage and salary standard . . . is established as 5.5 percent. The standard shall apply to any wage and salary increase payable with respect to an appropriate employee unit pursuant to an employment contract entered into or modified on or after November 14, 1971, or to a pay practice established, modified or administered with discretion on or after November 14, 1971.

6. Subsequently, the Board approved a 34¢ increase for the first year of the new contract, even though it exceeded the 5.5% standard, and, in addition, approved a 17¢ increase for the second year.

7. The Regulation read as follows:

Existing contracts and pay practices previously set forth will be allowed to operate according to their terms except that specific contracts or pay practices are subject to review, when challenged by a party at interest or by five or more members of the Pay Board, to determine

ions maintain that the 34 cents COLA overage portion of the proposed wage increase was agreed to prior to August 15, 1971, and scheduled to take effect after November 13, 1971, and that since no one sought to challenge the increase as provided by regulation, it should have been allowed. The 34 cents would then have become a part of the base wage; and the 17 cents general wage increase would have been measured against that base to determine if the increase exceeded the 5.5 percent standard. The district court agreed with the unions that the 34 cents COLA amount should be considered as agreed to prior to August 15, 1971, pursuant to the provisions of Section 203(c)(1), and remanded the cases to the Pay Board for reconsideration.[8]

The thrust of appellant's argument is that the purported overage agreements between the unions and their respective companies were in fact nothing more than preliminary negotiations, or agreements to agree in the future. If changing economic conditions or the availability of new trade-offs indicated a different compromise might be possible, the parties were free to later withdraw from these "preliminary positions." At best, appellant maintains, the agreements each contained a condition precedent to any increase in wages, that being the subsequent execution of a new collective bargaining agreement between the same parties setting forth the exact amount of COLA overage due, if any, and how it would be paid. Since the overage increases were conditional, appellant continues, no legal obligation to pay arose until new agreements were reached several months after August 15, 1971. Appellant concludes, then, that the COLA overage increases cannot be said to have been agreed upon in a contract executed prior to August 15, 1971, within the

meaning of Section 203(c)(1). For the purposes of the Act, the 34 cents COLA overage must be considered "new money", agreed to when the new collective bargaining agreements were signed in December finally satisfying the condition precedent to payment.

■■ Since appellant couches its argument in terms of traditional contract principles, it bears repeating at the outset that labor agreements are not considered to be, or construed as, ordinary commercial contracts. A collective bargaining compact must be interpreted in light of the "common law" of the shop —a composite of the history and practices of the industry and the disputing company and union. United Steelworkers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers v. Warrier & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L. Ed.2d 1424 (1960). This is not to say that principles familiar to the law of contracts are not sometimes useful in construing the terms of collective bargaining agreements. *See, generally, Summers, Collective Agreements and the Law of Contracts*, 78 Yale L.Rev. 525 (1969). The overriding concern of the courts in interpreting collective agreements, however, is to further the national policy of promoting labor peace. With this as a goal, arguments which dwell on the technicalities of contract law are peculiarly inappropriate.

The appellant's contention that the COLA overage agreements were merely preliminary negotiations or, if contracts, were conditional upon the signing of a new agreement, is simply not borne out by the record in this case. The UAW COLA letters express in clear and definite language the intent of the parties

---

whether any increase is unreasonably inconsistent with the criteria established by this Board. (November 13, 1971) Regulation § 201.14, 36 Fed.Reg. 21790.

8. Since the Pay Board had always considered the entire 51¢ to be new wages,

members of the Board had never had an opportunity to object to and review the 34¢ as a deferred wage increase under the provisions of Reg. § 201.14, note 6 *supra.*

that wages increase in a specified proportion to an increase in the cost of living as measured by the CPI, and that this increase "be available" as of specified dates. The parties to these agreements do not dispute their validity. Only the Pay Board argues they were not binding. While some terms were left open—the form of payment and the exact date payment was to begin were to be determined in the new three-year contracts—this does not signify that the *duty* to pay was conditioned upon the signing of new agreements. Stipulations entered into in this case indicate that, in each case, the company and the UAW agree that in the Fall of 1968 the company was under a present binding contractual obligation to pay whatever amounts might arise under the overage agreement.

In support of its argument, appellant points out that the UAW COLA overage letters were not signed until after the 1968 master agreements with the companies had been signed. Appellant claims, therefore, that the letters were not part of the master agreements and thus were not "offered in connection with an employment contract".[9] In addition, it is argued that the COLA letters, if not part of the 1968 master agreements, must have been only agreements to agree or preliminary negotiations in anticipation of the 1971 master agreements. This argument ignores a common practice in complex labor negotiations of the type involved here whereby parties enter into a master agreement covering only some of the points in issue and thereafter continue negotiating supplemental agreements. These supplemental agreements are no less binding than the earlier provisions of the master agreements. *See,* e. g., Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); Kentucky Skilled Craft Guild v. General Electric Co., 431 F.2d 62 (6th Cir. 1970).[10]

The appellant's argument that the agreements were in fact merely preliminary negotiations in connection with the 1971 agreements has more substance in the case of IAM, where overage agreements were not reached until a few days before the scheduled expiration of the 1968 agreements. The union and Lockheed had indeed begun negotiations for the new agreement, and the letter signed by Lockheed during these negotiations is admittedly ambiguous as to whether a binding overage agreement had been reached between the parties. As noted earlier, however, the affidavit of Floyd E. Smith indicates that a definite and binding overage agreement was reached on July 14, 1971. As *quid pro quo* for retroactivity, IAM agreed to extend the terms of the expiring contract including the no-strike clause. If this affidavit is accepted—and it stands unrefuted[11]—it must be concluded that the IAM agreements as to COLA overage were binding contractual agreements prior to August 15. It should be noted that such extensions of existing agreements in return

---

9. Section 203(c)(1), *supra*, note 1.

10. It is irrelevant that the COLA overage agreements extended beyond the term of the 1968 agreement, since it is clear that parties to a collective bargaining agreement may provide for the survival of obligations beyond the term of the agreement. *See,* e. g., Monroe Sander Corp. v. Livingston, 377 F.2d 6 (2d Cir.), cert. denied, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967). Appellant also argues that (c)(1) is inapplicable since the COLA overage increases were scheduled to "take effect" prior to, not after, November 13, 1971, inasmuch as they were retroactive to dates prior to Novem-

ber 13. It seems clear that the District Court was correct, however, when it stated that the increases did not "take effect" until the new contracts were made in December of 1971. To hold otherwise would in some cases exclude altogether from the provisions of Section 203(c) contracts providing for deferred wage increases retroactive to November 13 or before, a gap in coverage clearly not intended by Congress.

11. In addition, the affidavit is supported by the union's minutes of negotiation meetings held on July 13 and 14 which, although sketchy, are entirely consistent with the affidavit.

for some guaranteed benefit are not uncommon. *See,* e. g., Waters v. Wisconsin Steel Works of Intern'l Harvester Co., 427 F.2d 476 (7th Cir.), cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970). As in the UAW overage agreements, the duty to pay was not conditioned upon the signing of a new agreement. The Smith affidavit indicates payment was deferred only for the purpose of completing other contract changes so as to avoid piecemeal effectuation of contract terms, not because there was no existing obligation to pay.

In arguing that the overage agreements were conditional, the appellant attaches significance to the fact that the unions could have been decertified or replaced prior to the date overage payments were to begin, which was to be set in the 1971 agreement. The COLA overage agreements then would never have taken effect. Therefore, the appellant argues, there was no obligation to pay the overage amounts until the execution of a succeeding bargaining agreement with the same collective bargaining representative had triggered payment.

The possibility always exists that a representative union may be decertified or replaced, or, for that matter, that an employer may be replaced by a successor, thus nullifying previous agreements. Under the appellant's reasoning, then, contracts for deferred wages would never be binding until the time for payment had arrived. If this were true, it would have been pointless for Congress to pass Section 203(c)(1), which applies only to contracts for deferred wages and salaries. Obviously the Congress recognized that obligations under a labor contract, like those under a commercial contract, are not conditional merely because the possibility exists that the parties may be relieved of their duties by the occurrence of some later event. It could be argued that Congress intended Section 203(c)(1) to apply only to deferred wage increases scheduled to take effect at some time *during* the term of the collective bargaining agreement in which the increase was agreed to instead of at a date after the expiration of the agreement as is the case here. The contract bar rule, which prohibits decertification or replacement of a union during the term of a contract of three years or less, would make the ultimate performance of the deferred wage term more certain if the increases were scheduled to take place within the protected period. Continuation of the bargaining relationship for the term of the contract is by no means certain, however, since other circumstances, such as a schism within the union, the defunctness of the union, or certain company changes in operations, may intervene at any time to raise the contract bar. *See,* generally, Morris, The Developing Labor Law 162–182 (1971). The certainty of performance, therefore, is simply a matter of degree, and the legislative history of Section 203(c)(1) shows no intent on the part of Congress to make fine distinctions based upon the dates deferred pay increases are to begin. The important concern is with the expectations of the workers, see text accompanying note 13 *infra,* and, with this in mind, each case must be considered in light of its own circumstances.

■ The legislative history of the Act clearly supports our conclusion that the overage agreements at issue here are contracts within the meaning of Section 203(c)(1). A contrary ruling would frustrate the intent of Congress in passing the legislation. On August 15, 1971, without prior warning, a freeze was placed on wages and prices, and when lifted 90 days later was replaced with strict limitations on yearly wage increases. In passing Section 203(c), Congress intended to ensure equitable treatment to wage earners who expected wage increases which were scheduled prior to the freeze but which were not to take effect until after August

15, 1971.[12] One of the principal concerns of Congress was to prevent unnecessary hardship on workers who had made "important financial commitments in rightful anticipation of receiving scheduled wage and salary increases".[13] The evidence in this case reflects that, prior to August 15, 1971, the employees of the aerospace companies had every reason to expect to receive the COLA increases provided for in the overage agreements here at issue. The overage agreements were valid and binding on the parties. There was no evidence of any sort to indicate that the unions had lost their majority status. The old contracts between IAM and Lockheed had been extended, and the parties were in the process of negotiating new agreements. The termination dates of the UAW agreements were only a few weeks away and no challenge had been made to the union. Furthermore, the record reflects a history of stable bargaining relationships and consistently tandem increases in wages in the aerospace companies involved in this case.[14] Quite clearly the workers were justified in committing themselves financially in anticipation of receiving the COLA overage adjustments. If the COLA overage agreements, then, are not considered contracts within the meaning of Section 203(c)(1), one of the principal aims of the section will be thwarted.

In sum, the decision of the District Court is consistent with the law and the facts in this cause, and it is hereby AFFIRMED. The case is remanded to the Pay Board, or other appropriate body designated by the President, for further consideration in light of this holding.

12. See, generally, H.R.Rep.No.714, 92d Cong., 1st Sess. (1971); S.Rep.No.507, 92d Cong., 1st Sess. (1971); Conf.Rep. No.753, 92d Cong., 1st Sess. (1971), U.S. Code Cong. & Admin.News 1971, p. 2283.

13. H.R.Rep.No.714, 92d Cong., 1st Sess. (1971).

14. Since 1965, hourly wage increases at these companies have followed each other in time and amount.