LAWS OF 1975, Ch. 868; NEW YORK STATE FINANCIAL EMERGENCY ACTFOR THE CITY OF NEW YORK; POWER OF "COVERED AGENCY" TO AGREE WITHEMPLOYEES FOR COST OF LIVING WAGE INCREASE.
This is in reply to your letter of April 21, 1976, in which you request my opinion as to whether the payment of cost-of-living adjustments by the New York City Transit Authority (the "TA") pursuant to a collective bargaining agreement with the Transport Workers Union of America (the "TWU"), is subject to suspension by operation of § 10(1) of the Financial Emergency Act for the City of New York, enacted on September 9, 1975 (Laws of 1975, Ch. 868, § 2, as amended by Ch. 870, § 11) (the "Act").
HON. HUGH L. CAREY Chairman Emergency Financial Control Board for the City of New York
The wage freeze provision set forth in § 10 of the Act reads, in pertinent part, as follows:
 "1. Increases in salary or wages of employees of the city and employees of covered organizations which have taken effect since June thirtieth, nineteen hundred seventy-five or which will take effect after that date pursuant to collective bargaining agreements or other analogous contracts, now in existence or hereafter entered into, requiring such salary increases as of July first, nineteen hundred seventy-five or as of any date thereafter are hereby suspended. * * *"
Section 2, subd. 5 of the Act defines covered organizations referred to in the wage freeze provision to specifically include the New York City Transit Authority. Recently, in In reSubway-Surface Supervisors Ass'n (New York City Transit Authority), Supreme Court, Spec. Term, Kings County, N.Y.L.J., March 3, 1976, Justice Composto in holding that transit employees were subject to the application of the wage freeze provision and in rejecting their contention that application of such provision would constitute an unconstitutional impairment of contractual rights, stated:
 "It is the opinion of the court that the respective financial conditions of the City of New York and the New York City Transit Authority are dependent upon each other and interwined to such an extent that the Legislature was justified in including the Transit Authority as a `covered organization' in devising an emergency plan to solve the fiscal crisis in the City. Thus, under the police powers of the State, the wage freeze for Transit Authority employees serves a paramount public purpose and is properly directed toward the alleviation of the emergency with which we are now confronted."
Since the collective bargaining agreements between the TA and TWU are subject to the provisions of the Act, the question arises as to whether payment of cost-of-living adjustments would constitute "increases in salary or wages" within the meaning of the wage freeze provision of § 10(1).
Although the Act does not define "salary or wages", the term "wages" is generally interpreted to include "all of the benefits, monetary or otherwise, which an employee derives from a master and servant relationship." People v. Vetri, 309 N.Y. 401, 407
(1955). Such definition as well as the common usage of the term salary or wages would clearly encompass the payment of cost-of-living adjustments.
In fact, the provisions for payment of cost-of-living adjustments in the TA-TWU Agreement are set forth in Article V of such agreement under the specific heading "Wages".
The interpretation of the term "salary or wages" to include cost-of-living adjustments is in accord with earlier Federal regulations dealing with wage controls. Under the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, Economic Stabilization Regulation § 201.2 of the Federal Pay Board defined "wages and salaries" as including ". . . all forms of direct and indirect remuneration or inducement to employees by their employers for personal services, which are reasonably subject to evaluation, including . . . cost-of-living allowances . . ."Cf. Boldt v. International Union, United Auto A. A.I.Workers, 482 F.2d 985 (Temp. Emergency Court of Appeals, 1973).
The fact that cost-of-living adjustments are generally recognized as salary or wages is also reflected in the practice of New York City and the Board of Education in the years after World War II to grant cost-of-living increases conditioned upon the issuance of a waiver by City employees providing that such increase would not be considered as salary for pension purposes. Matter ofCarroll v. Grumet, 281 App. Div. 35 (1st Dept., 1952), motionfor leave to appeal denied 281 App. Div. 863, motion to dismissappeal granted, 305 N.Y. 692; Rosen v. Teachers' RetirementBoard, 282 App. Div. 216 (1st Dept., 1953). The waiver would have been superfluous if the cost-of-living increase were not salary or wages. Indeed, in the Carroll case, supra, the Court observed "[I]f the increased compensation [a cost-of-living bonus] had been unconditionally granted by the city without question it would have constituted salary or compensation for pension purposes." 281 App. Div. at 37.
It is clear that any interpretation which would exclude cost-of-living adjustments from the wage freeze provided by § 10 would frustrate the purpose and intent of that section of the Act.
In construing statutory provisions, "the spirit and purpose of the statute and the objectives sought to be accomplished by the Legislature must be borne in mind. `The legislative intent is the great and controlling principle'" Matter of Petterson v.Daystrom Corp., 17 N.Y.2d 32, 38 (1966); Matter of New YorkPost Corp. v. Leibowitz, 2 N.Y.2d 677, 685 (1957); Matter ofHogan v. Culkin, 18 N.Y.2d 330, 335 (1966); Matter ofAlbano v. Kirby, 36 N.Y.2d 526, 529-530 (1975).
The purposes of the Financial Emergency Act and legislative findings are set forth in § 1 in the following grave terms:
 "It is hereby found and declared that a financial emergency and an emergency period exists in the city of New York. The city is unable to obtain the funds needed by the city to continue to provide essential services to its inhabitants or to meet its obligations to the holders of outstanding securities. Unless such funds are obtained the city will soon (i) fail to pay salaries and wages to employees and amounts owed vendors and suppliers to the city, (ii) fail to pay amounts due to persons receiving assistance from the city and (iii) default on the interest and principal payments due the holders of outstanding obligations of the city.
 If such failures and defaults were to occur, the effect on the city and its inhabitants would be devastating: (1) unpaid employees might refuse to work; (2) unpaid vendors and suppliers might refuse to sell their goods and render services to the city; (3) unpaid recipients of public assistance would be unable to provide themselves with the basic necessities of life; and (4) unpaid holders of city obligations would seek judicial enforcement of their legal rights as to city revenues. These events would effectively force the city to stop operating as a viable governmental entity and create a clear and present danger to the health, safety and welfare of its inhabitants.
* * *
 This situation is a disaster and creates a state of emergency. To end this disaster, to bring the emergency under control and to respond to the overriding state concern described above, the state must undertake an extraordinary exercise of its police and emergency powers under the state constitution, and exercise controls and supervision over the financial affairs of the city of New York, but in a manner intended to preserve the ability of city officials to determine programs and expenditure priorities within available financial resources." * * *
Since payments of wages to employees of mayoral and covered agencies constitute the largest portion of New York City's expense budget, the wage freeze provision in § 10 was a key element in the Act designed by the Legislature to avert the financial collapse of the City of New York. Under § 10, the New York State Emergency Financial Control Board (the "Board") is given authority to extend the wage freeze until such date as the Board deems necessary to achieve the objectives of the financial plan. Excluding cost-of-living adjustments from the wage freeze would provide a mechanism for circumventing any action by the Control Board to limit the City's increasing wage expenses. Obviously, such an interpretation would negate and contravene the objective of the Legislature in enacting the wage freeze provision.
In light of all the above considerations, I conclude that payment of cost-of-living adjustments by the TA would violate the wage freeze mandate of § 10, subd. 1 of the Act.
In issuing this opinion, I have responded to the specific legal question raised in your letter concerning the operation of § 10(1) of the Act. Accordingly, I have not dealt with the powers of the Board which are committed to its discretion by the Act including the authority to determine whether, in its judgment, the performance of a collective bargaining contract would be "inconsistent with the financial plan" (§ 7[e] [iii]), or its authority under § 10(2) of the Act to certify whether an agreement in writing for a deferment of salary or wage increase constitutes "an acceptable and appropriate contribution toward alleviating the fiscal crisis of the City," or "if it finds that the fiscal crisis has been sufficiently alleviated or for any other appropriate reason," to "direct that the suspensions of salary or wage increases or suspensions of other increased payments shall, in whole or in part, be terminated."
While no public official can be oblivious to the sacrifices that governmental employees as well as all citizens of New York City have to bear during this fiscal crisis, it is in everyone's interest that the provisions of the Financial Emergency Act be strictly enforced if the City of New York is to be restored to financial health and the present state of emergency is to be terminated.