**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GRAND FOUNDRIES, INC., Respondent.**

**No. 18192.**

United States Court of Appeals
Eighth Circuit.

June 21, 1966.

Bernard Dworski, Attorney, N.L.R.B., Washington, D. C., for petitioner; Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel and Melvin Pollack, Attorney, N.L.R.B., Washington, D. C., on the brief.

Donald W. Jones, of Daniel, Clampett, Ellis, Rittershouse & Dalton, Springfield, Mo., for respondent; Ransom A. Ellis, Jr., of Daniel, Clampett, Ellis, Rittershouse & Dalton, Springfield, Mo., on the brief.

Before MATTHES, MEHAFFY and GIBSON, Circuit Judges.

GIBSON, Circuit Judge.

Petitioner, National Labor Relations Board (Board), seeks enforcement of its order of March 1965 issued against Grand Foundries, Inc., Respondent.[1]

The Board found that Respondent violated § 8(a) (1) of the Act,[2] by promising economic benefits to employees and interrogating its employees about their union membership and activities; violated § 8(a) (2) (1) by dominating and interfering with the formation and administration of the "Employees' Shop Committee"; and violated § 8(a) (3) and (1) by discharging employee Otis Kerr because of his union activity.

The Respondent operates its plant at Springfield, Missouri, manufacturing tandem parts for trucks and tractors and had at the time of the hearing in this case about fifty employees. The Respondent commenced business in 1963, after moving a prior affiliated operation, Hutchens and Sons Metal Products Company, from Springfield to Marshfield, Missouri; and employed some of the former employees of the affiliated company in the Respondent's Springfield operation.

Organizing activity among Respondent's employees was commenced by Sheet Metal Workers International Association, Local Union No. 146, AFL–CIO in late February 1964. Literature was distributed at the plant exits on February 28, 1964. Employee Otis Kerr began talking to the other employees in favor of the union's organizing drive four or five days prior to the distribution of the union's literature. During this period of time the Respondent's president, Lewis G. Hutchens, caused to be posted a notice for the formation of an Employees' Shop Committee, to provide representation for hourly workers in the Foundry and Wheel Division. The Committee was to be made up of one elected representative from each of the five departments, Melting, Core, Cleaning, Molding, and Wheel Division. The notice stated the purpose of the Committee [3] and stated that the Committee would meet regularly with Mr. Beyer, the purchasing agent of the Respondent, who also handled the personnel records. Mr. Beyer was to represent management but had no power to bind management and was only to serve with the Committee in order to receive the Committee's recommendations and ideas, transmit them to management,

1. The Board's decision and order are reported at 151 NLRB No. 118.

2. All sectional references are to the National Labor Relations Act, as amended, 61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq., unless otherwise designated.

3. The notice contains the following paragraph:

"This will provide you and your fellow workers with a means of expressing opinions and ideas to management; to help in settling grievances that may arise from time to time; to give you a hand in looking after your own welfare; and to assist in making this a better place to work."

and later advise the Committee of what action management decided to take on the suggestions, recommendations, and requests received from the Committee. Beyer also served as moderator of the Shop Committee meetings, which were held in the company's conference rooms and on company time. The Committee met biweekly. A similar shop committee had been established in the affiliated operation of Hutchens and Sons Metal Products Company. The genesis of the Shop Committee of Respondent's plant apparently originated from a conversation with employee Willard Moore, who had previously been employed by the affiliated company. He requested President Hutchens about the middle of February 1964 to institute an Employees' Shop Committee in Respondent's operation along the lines of the previous shop committee in the affiliated company. The · date of this request is not definite but apparently preceded by a few days the beginning of union activity in the Respondent's plant. The Shop Committee held its first meeting on March 17, 1964, after almost all of the employees had voted for their particular representative, and continued to meet regularly biweekly thereafter. Most of the meeting time was spent in discussing safety matters and a small portion of time spent in discussing grievances, pay, and in the adoption of a shop manual.

Shortly after the organizing drive began, Works Manager Furlani, who also was responsible for all of the hiring of personnel, asked employee Harold Braden "if he was supporting the union" and "if he knew of any of his fellow employees who were in sympathy with the union." Braden replied in the negative to both inquiries. A second inquiry of Braden was made in March along the same line with the same result. At that time Braden reassured Furlani that he personally was not supporting the union and that he still did not know of anyone who was. Furlani asked Braden how

much he was making per hour and according to Braden's testimony promised him that he would "probably be getting more later." [4] Furlani had a third conversation with Braden along in May, asking him if he "knew of anyone that was for the union." Braden's reply was again "No." Another employee, Donald Smith, during the early part of the union's campaign was asked by Furlani if he knew if any of the new men were for the union. Smith answered in the negative; and in a second conversation with Smith several weeks later, Furlani informed him that two or three of the employees had informed Furlani who it was that had been talking for the union and Furlani wanted Smith to verify these facts. Smith refused to do so. Weldon Stafford, a member of the Shop Committee, was approached in early March by Furlani with a request to use his influence to keep the union out. Furlani said to him: "Stafford, you are the oldest man in the core room and I believe the men will listen to you. I want you to use your influence to keep the union out. I don't want to—I am not against unions, but I would rather spend my money some place else." Furlani further remarked "when this thing pops [referring to the union], Mr. Hutchens will pay more money. I know him and I worked for him a number of years * * *". Stafford was under the impression that he had been promised a wage increase, and when he did not get it brought the matter up at one of the Shop Committee meetings. Furlani denied making the above statements to the employees and denied specifically having promised Stafford a raise and told Stafford that he had no right to discuss wages, (presumably at Committee meetings) because Furlani "ran the Foundry as he saw fit."

Employee Otis Kerr was employed in the Grinding Department from June 1963 until May 20, 1964, the date of his discharge. Kerr was active in behalf of the union though he did not want man-

---

4. Record, page 40 reads as follows:
 A. "He [Furlani] asked me how much I was getting, and I said a dollar seventy-five, and he said you will probably be getting more later, and June 1st we did, we all got a dime raise."

agement to be apprised of or to become aware of his activities. Kerr apparently was a good worker and had received an "Employee of the Month" award in March 1964 for "outstanding conduct and work habits, exceptional cooperation and setting a fine example for his fellow workers." Some two months later Kerr was offered the foremanship of the night shift but refused to take it because of personal reasons.

On May 13, 1964, a fellow employee, Melvin Crawford, testified that Kerr had accused him of informing management of Kerr's union activity. Crawford heatedly denied this and Kerr further accused Crawford of talking to several employees about the union, whereupon Crawford remarked that he had as much right to his opinion about the union as did Kerr. When Crawford was withdrawing from the argument, Kerr told him that if he ever went to the office or told any of them about Kerr's activities he "would maul his face in." Kerr denied making this threat. Crawford reported his views of the argument to management and was given an oral reprimand for his part in the dispute and was told that he would be dismissed if he repeated a like performance. Kerr received a formal written reprimand for his conduct, the reprimand stating that he had previously been reported as causing turmoil and was advised that he would be dismissed "if this sort of conduct were repeated."

On the afternoon of May 20, 1964, while Kerr was working at his grinding machine, a new employee named McLaughlin, apparently purposely and deliberately, accused Kerr of having "put the finger" on a friend of McLaughlin's; the friend being the owner of a local tavern known as the Hillbilly Club. This Club had been raided and lost its liquor license. McLaughlin made some statement about losing $15,000 in some manner in this operation. Kerr appeared to be mystified about the accusation, denied it and denied that he knew anything at all about the Hillbilly Club. McLaughlin was loud, abusive and aggressive in

his actions towards Kerr and used the palm of his hand to slap or stiff arm Kerr while making his tirade. McLaughlin also used a lighted cigarette to punch against Kerr's bare breast. Kerr apparently was visibly astonished by the accusation and the belligerent attitude of McLaughlin and did not respond to the attack. Kerr backed away and called to a fellow employee, Gary Mitchell, to help him, and at the same time sought to find Foreman Jerry King. He found King and then requested that he be taken to Work Manager Furlani. They located Furlani, went to his office, at which time Furlani discharged both Kerr and McLaughlin, saying "you boys know the rules on fighting. I will have to let you both go." Kerr protested that he had struck no blows but was the victim of McLaughlin's animosity. McLaughlin evidently was hired under an alias, his real name being Blumer. He had worked only three days and had been hired by Furlani. There is some intimation from the Examiner and the Board that this altercation of McLaughlin and Kerr's was a put-up job arranged by management solely for the purpose of firing Kerr. This accusation, however, is not made on the record, and at the hearing before this Court, petitioner admitted it was making no charge that management was in complicity with McLaughlin in causing or conducting this aggressive episode. Although McLaughlin apparently is a shadowy figure, and on the record appears to definitely be the instigator of this dispute, he was not called to testify; nor was any other testimony presented about his motives or concerning management's knowledge of or participation with him in his unusual tirade. Just before Furlani had fired both men, the foreman, Jerry King, had informed him that both men had been fighting.

The Trial Examiner's Report found the company in violation of the Act in two respects. This report was adopted in toto by the Board with the additional finding "that Works Manager Furlani's promise of a wage increase to employee

Braden constitutes a violation of Section 8(a) (1) of the Act." The Board now seeks: (1) that a cease and desist order be issued restraining Respondent from interrogating its employees unlawfully as to their union membership and activities and from promising its employees benefits in return for their opposition to the union; (2) withdrawal and withholding of all recognition from, and complete disestablishment of the Employees' Shop Committee, which is conceded to be a labor organization under the Act; and (3) reinstatement of Kerr with monetary damages for any loss of income as a result of the alleged discriminatory discharge. And further, that a notice be posted on the company's office setting forth these cease and desist orders together with a catchall or general order restraining Respondent from interfering in any manner with or restraining or coercing employees in the exercise of their rights as guaranteed by § 7 of the Act.

Respondent contends that there is no substantial evidentiary support for the Board's determination finding Respondent guilty of the unfair labor practices charged, and further contends that the Trial Examiner's decision reveals such bias and prejudice against Respondent as to shock the conscience of the Court.

Our duty is to review the record and determine the substantiality of the evidence "on the record as a whole." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, at page 490, 71 S.Ct. 456, at page 466, 95 L.Ed. 456 (1951) held:

"The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."

and at 491, 71 S.Ct. at 466:

"Whether on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the Courts of Appeals."

Universal Camera also pointed out that the Examiner's report is part of the record and must be given consideration, and that "the significance of his report, of course, depends largely upon the importance of credibility" findings (l. c. 496, 71 S.Ct. l. c. 469). The Trial Examiner in this case attempted to bolster his credibility findings by specifically stating what witnesses he found to be credible and those which he did not credit. In general he placed no credibility in Furlani, the Works Manager, or in Mr. Hutchens, the President.

We will consider the violations as listed in the complaint.

### Violation of Section 8(a) (1)— Interference With or Coercion of Employees

Did Respondent interfere with, restrain, or coerce its employees in their exercise of their right to organize or to join a labor organization, as proscribed by § 8(a) (1)?[5] Works Manager Furlani had the right to ask any employee if that employee were supporting the union or if he were in favor of the union

5. 29 U.S.C. 158 (§ 8 of the Act) reads as follows:
"§ 158 Unfair Labor Practices
"(a) It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;"
Section 157 reads as follows:
"Right of employees as to organization, collective bargaining, etc.
"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."

and to also present management's view or argument on the union issue. These statements are protected by § 8(c),[6] and under the First Amendment to the Constitution as free speech, and cannot be used as evidence of an unfair labor practice. Gem International, Inc. v. N. L. R. B., 321 F.2d 626 (8 Cir. 1963); Continental Distilling Sales Company v. N. L. R. B., 348 F.2d 246 (7 Cir. 1965). Each side is accorded the right of persuasion and denied the use of coercion. Management may express an anti-union animus as well as the union expressing an anti-management animus, neither constituting an unfair labor practice. See N. L. R. B. v. Colvert Dairy Products Company, 317 F.2d 44 (10 Cir. 1963).

However, in discussing the issue with employees no threat of reprisal or force or promise of benefit may be used or applied by management. Thus Furlani's questioning of Braden was permissible; the only question here being whether Furlani's promise that Braden would "probably be getting more later" in reference to his wages amounted to the promise of a benefit. Furlani's questioning of Smith was protected under the Act as was the same questioning of Stafford. The only question here being whether Furlani's statements to Stafford of: "I want you to use your influence to keep the union out. I am not against unions but I would rather spend my money some place else."; and his remark that "when this thing pops [evidently referring to the union] Mr. Hutchens will pay more money. I know him and I worked for him a number of years.", amounts to a promise of benefit.

 Although Furlani denies making the above statements, the credibility issue has been resolved by the Examiner and the Board in favor of the employees' and ex-employees' testimony on this issue. This is a proper function of the Examiner and the Board, and will not be disturbed

by us absent a clear showing of abuse, which we do not find in this case. See N. L. R. B. v. Morrison Cafeteria Company of Little Rock, Inc., 311 F.2d 534, 538 (8 Cir. 1963). These statements made in the midst of a union-organizing campaign contain the definite promise of a benefit to the employees and extend beyond the permissible sphere of persuasion and argument. Respondent contends that this disputed evidence notwithstanding its accreditation by the Trial Examiner and the Board "as too thin a crust on which to rest anything as serious as an 8(a) (1) violation" citing Judge Blackmun's opinion in N. L. R. B. v. Council Manufacturing Corporation, 334 F.2d 161, 165 (8 Cir. 1964), but the facts of the *Council* case are not applicable here. Only discussion of a newspaper article about union activity was involved in *Council.* Here Furlani made a definite promise of benefits and we cannot say that this evidence on the record as a whole is not sufficient to substantiate the Board's finding of Respondent's violation of § 8(a) (1) by promising this definite benefit to employees. Management's rights under § 8(c) and the First Amendment to the Constitution are not inconsequential. Inquiries to employees about their union feelings, even arguments and reasoning with employees on the merits of unions are permissible, but the proscription of the Act, against coercion and the use of management's economic power in the promise of benefits, applies. The decisional law has increasingly delineated the rights of management in this field. See N. L. R. B. v. Council Manufacturing Corporation, supra; N. L. R. B. v. Trumbull Asphalt Company of Delaware, 327 F.2d 841 (8 Cir. 1964); N. L. R. B. v. Colvert Dairy Products Company, 317 F.2d 44 (10 Cir. 1963); N. L. R. B. v. South Rambler Company, 324 F.2d 447 (8 Cir. 1963); N. L. R. B. v. Johnnie's Poultry Co., 344

6. § 8(c):
 "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

F.2d 617 (8 Cir. 1965). However, as recognized by the Act, an employee is not theoretically or practically on a par economically with management and can only secure economic equality or parity through the collective-bargaining process. This policy against economic persuasion through promise of benefits has been set by Congress, and when management steps beyond the sphere of uncoercive oral or written persuasion and argument, the protection afforded by § 8(c) and the First Amendment to the Constitution is no longer applicable.

The Board's decision on this issue is affirmed and enforcement is granted.

### Section 8(a) (2) and (1)—Issue of Dominating and Interfering With the Formation and Administration of the Employees' Shop Committee

The Employees' Shop Committee is conceded by Respondent to be a labor organization under the Act. The details of the formation of this Committee are set forth in the factual narrative at the onset of this opinion and will not be repeated. Although the request for its setup came from an employee, Willard Moore, who had previously worked for the affiliated operation, the fact remains that the Committee was put into effect and promulgated by management, under the aegis of management, utilizing company space and time, with a management representative, Mr. Beyer, actively moderating the meetings. The employees had no meetings discussing the advisability or their desire for such an organization, and they actually played no part as a group in originating and organizing this Committee as a representative bargaining unit for employees. Mr. Beyer, manager's representative, attended every meeting and could convey to management all of the discussions and questions raised at the meetings. He even prepared the minutes of the meeting. No doubt this type of Committee could and probably did serve a salutory and useful function in furthering harmonious plant operations by discussing safety practices and processing minor grievances, but it certainly was not set up to and was not so constituted as to further free and unfetter discussion and consideration of employees' rights as envisioned by the Act. Exchange of ideas and discussion of views as between employees and management could not be conducted as equals in this type of Shop Committee organization. No major policy questions on organization, bargaining or wages were discussed.

■ The acts of management in setting up, organizing, and conducting the meetings of the Employees' Shop Committee, we feel, goes beyond mere allowable cooperation and support, as held in Chicago Rawhide Manufacturing Company v. N. L. R. B., 221 F.2d 165 (7 Cir. 1955) cited by Respondent. We think the Employees' Shop Committee was under the dominance of management in violation of § 8(a) (2) and (1) of the Act and that there is substantial evidence on the whole record to warrant enforcement of the Board's order on this issue.

### Violation of § 8(a) (3) and (1)— Discharge of Employee Kerr

■ The issue here presented is whether Kerr was discharged for his union activity. If so, the discharge would be discriminatory under § 8(a) (3) and (1) and would be an unfair labor practice proscribed by the Act. The General Counsel has the burden of proving an unfair labor practice by a preponderance of the evidence. Iowa Beef Packers, Inc. v. N. L. R. B., 331 F.2d 176, 182 (8 Cir. 1964); Cedar Rapids Block Company v. N. L. R. B., 332 F.2d 880 (8 Cir. 1964); Bituminous Material and Supply Co. v. N. L. R. B., 281 F.2d 365, 367 (8 Cir. 1960). As stated in N. L. R. B. v. Council Manufacturing Corporation, supra, 334 F.2d at 164:

"* * * this court has also observed that coincidence in union activity and discharge renders an employer vulnerable and serves to make the discharge issue one of fact. N. L. R. B. v. Des Moines Foods, Inc., 296 F.2d 285, 289 (8 Cir. 1961)" (and other cases).

The Board has made its factual determination, but is the determination supported by substantial evidence on the whole record? Was Kerr discharged because of what management thought to be a bona fide altercation in violation of rules, or for an unusual psychotic incident triggered solely by the abberations of McLaughlin, nee Blumer, or for a dispute having some factual basis, or on a trumped-up charge or pretext? If it is on a trumped-up charge or pretext, the company is responsible, and Kerr should be offered reinstatement with damages sufficient to make him whole. Otherwise the Respondent is not responsible for, it absent any contractual restrictions, could discharge Kerr for any reason or for no reason at all, except that he could not be discharged for his union activity or sympathy. See N. L. R. B. v. South Rambler Company, 324 F.2d 447, 449 (8 Cir. 1963).

The record is devoid of substantial evidence that the McLaughlin-Kerr incident was a trumped-up charge or an episode created by management to supply a seemingly bona fide pretext for Kerr's discharge. Although management should perhaps attempt to assess fault in a patently one-sided altercation, it cannot be said that Kerr was previously blameless of any prior altercations or disputes with other employees, i. e., his argument with Crawford with the "maul in the face" episode, employee Tuhey's complaint who had asked Furlani to get Kerr "off his back" when Kerr was attempting to argue with Tuhey about the union. The most that can be said in attempting to analyze the record on this issue is that the altercation or incident resulting in Kerr's discharge was unusual and bizarre. The occurrence of the incident and the manner in which it was handled by Furlani does give rise to some inference of a discriminatory discharge. The inference, however, in view of the whole background of Kerr's conduct cannot constitute proof that his firing was actually done because of the exercise of his right of union activity under the Act. As previously stated the General Counsel has the burden of showing the discharge is unlawful by preponderance of the evidence. The record in this respect leaves much to be desired. The one person who could supply the answer or answers to the discharge was McLaughlin, nee Blumer. He was not called as a witness nor was his absence duly accounted for. There was no evidence connecting management with this bizarre altercation and under the circumstances that it occurred with Foreman Jerry King relaying to Furlani that there was a fight between two men, Furlani had a right to enforce the shop rules by firing both men. The evidence on this point is, admittedly, not entirely satisfactory; thus, posing a close question. For in one view Kerr does appear to be a victim of an unusual occurrence. However, we do not feel that there is a preponderance of the evidence showing that the altercation was only a pretext for his discharge.

Although union activity may not serve as the basis for a discharge, neither may such activity serve as an insurance policy against discharge. We recognize that it is sometimes very difficult to ascertain the true reason for an employee's discharge; that when a discharge is actually for union activity, management would not frankly admit to that reason and thus inferences must be drawn from the evidence adduced. However, like circumstantial evidence in civil cases, the evidence must lead to a reasonable conviction or be the basis for leading to a reasonable conviction and finding that the fact (discharge for union activity) sought to be proved is more likely so than not so; otherwise we are still left within the realm of mere speculation or conjecture. We feel the Board's finding of a discriminatory discharge of Kerr, on the record, is based on mere conjecture and speculation. We, therefore, deny enforcement of this part of the Board's order.

Respondent's contention that "Trial Examiner's decision reveals bias and prejudice against Respondent as should shock the conscience of the court" does

not appear well founded. A reading of the record discloses that the Trial Examiner conducted an orderly hearing, allowing each side the same latitude in the presentation of their evidence and in ruling upon the various objections. He was uniformly respectful of and courteous to all parties and the record does not evidence any prejudice, bias or animus against Respondent.

The petition for enforcement is granted as respects the § 8(a) (1) violation of promising benefits to employees and the § 8(a) (2) and (1) violation of dominating and interfering with the formation and administration of the Employees' Shop Committee. It is denied as respects the § 8(a) (3) and (1) violation of discharging employee Kerr.