**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CONSTRUCTION AND GENERAL LABORERS' UNION LOCAL NO. 534,** Laborers' International Union of North America, AFL–CIO, CLC, **Respondent.**

No. 84–6087.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 24, 1985.

Decided Dec. 11, 1985.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Elinor Stillman, Mark McCarty, argued, Washington, D.C., for petitioner.

Lawrence Oberdank, argued, Riemer, Oberdank and Cowan, Cleveland, Ohio for respondent.

Before KENNEDY and MILBURN, Circuit Judges, and COOK,* District Judge.

CORNELIA G. KENNEDY, Circuit Judge.

This is an application by the National Labor Relations Board to enforce an order of the Board.[1] The Board found that respondent Union violated the National Labor Relations Act, 29 U.S.C. §§ 151–68, by arbitrarily departing from objective hiring hall procedures set forth in an agreement between the Union and an association of contractors. It found further that the Union president violated the Act by threatening employees with reprisals if they filed unfair labor practice charges with the Board.

---

* The Honorable Julian Abele Cook, Jr., United States District Court for the Eastern District of Michigan, sitting by designation.

1. The Board's order is reprinted at 275 N.L.R.B. No. 143 (1984).

The Union represents employees in the building and construction trade industry and maintains its principal office in Middletown, Ohio. The Butler County Area Contractors Association is the bargaining representative for certain employers engaged in the building and construction industry. The Association and the Union entered into a collective bargaining agreement effective at all times relevant to this proceeding. Under the agreement, the Union operated an exclusive hiring hall for the referral of applicants to the Association employers. The referral procedures are contained in Article II of the agreement. Section 1 allows the employer to directly recruit, solely at his discretion, one "key man" for each job. Section 2 provides that for all other workmen, the employer shall only hire persons referred by the Union.

The remaining sections establish the manner in which the Union shall refer workers. Section 7 establishes a plan for registering and ranking available workers. There are five groups of applicants; each group contains workers with roughly equivalent work experience and residency in the local area. Group A is the highest group; group E is the lowest. Section 8 provides that workers shall be placed on the applicable group lists in the order in which they registered as available for employment.[2] When an employer notifies the Union that it needs workers, the Union is required to begin at the top of group A and go through the names on the list in order. Section 9. If the worker whose name is called is present, he may accept the job or have his name moved to the bottom of his group's list.[3] Section 9. If a worker is referred to a job that lasts more than five days, his name is removed from the list until he once again seeks to register, at which time his name is placed at the bottom of the appropriate group list. If all of the jobs are not filled after the group A list

is read through, the Union is then required to read through group B, and so on.

Section 13 sets forth two exceptions to the order of referral just described. First, where an employer requires and calls for employees possessing special skills and abilities, the Union shall refer the first applicant on the register possessing such special skills and abilities. Second, an employer may "call back" former employees by name if the worker requested (a) has worked for that employer within the last six months, and (b) has not been employed since then or has been laid off for five or more working days from the last employer. Section 5 also reserves to the employer the right to accept or reject any applicants referred or to discharge any employees who have been accepted but prove to be unsatisfactory.

The first category of alleged unfair labor practices by the Union involves complaints by two Union members, Darryl Thomas and Charles Baldwin, that the Union violated the referral procedure and offered jobs to four workers who were lower on the group lists.[4] The Union offered two reasons for these four contested referrals. The Union claimed that Al Smith and Denver Harris were called back by their former employers and that James Crawford and Carl Logan were selected by the Union to be union stewards at their respective workplaces.

The Administrative Law Judge found that the referrals did not comport with the terms of the collective bargaining agreement and that such deviations were arbitrary and without justification. He also found that certain statements by the Union president threatened members with reprisals if they filed unfair labor practice charges with the Board. Thus, the Union had violated sections 8(b)(1)(A) and 8(b)(2)

---

**2.** To maintain one's place on the list, one must sign the daily register at least one day each calendar month. Section 7.

**3.** The ALJ heard testimony that workers were often allowed to "pass" when their name was called so that other workers could take the jobs

that were offered. The Board did not base its holding on this practice.

**4.** The four workers were James Crawford, Carl Logan, Al Smith and Denver Harris.

of the Act.[5] The ALJ recommended a cease and desist order to stop the Union from refusing to refer Thomas and Baldwin according to the referral system and to prevent deviations in general. The recommended order also included a restraint on threatened reprisals, affirmative relief for Thomas and Baldwin, and the posting of a notice to the effect that the above will be complied with. The Board affirmed the ALJ's rulings, findings, and conclusions and adopted his recommended order. The Board now seeks to enforce that order.

In reviewing the Board's findings, our inquiry is limited to whether those findings are supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 493, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951). Also, where the Board's interpretation of a collective bargaining agreement is reasonable and consistent with the policies of the Act, that interpretation is entitled to deference. *NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822, 104 S.Ct. 1505, 1510, 79 L.Ed.2d 839 (1984).

The Union is charged with restraining or coercing employees in the exercise of their right to refrain from joining or assisting unions and with causing employers to encourage or discourage union membership by discrimination in regard to hire, tenure, or conditions of employment. This Court has set forth the elements of such charges in the context of exclusive hiring halls.

Because the Act only proscribes encouragement or discouragement of union membership which is accomplished through discrimination, a union does not commit an unfair labor practice unless it administers an exclusive hiring hall in a discriminatory or arbitrary fashion. In order to find a violation of the Act in the operation of an exclusive hiring hall, the Board need not have specific evidence of intent to encourage or discourage union membership; the Board may find a violation where the union refuses to place non-members on the referral list or gives members preference on the referral list or give [sic] members preferences over non-members in referrals.

*Local Union No. 948, IBEW v. NLRB*, 697 F.2d 113, 116 (6th Cir.1982) (citations omitted). The Board found, and the Union does not dispute, that the only issue with respect to the alleged section 8(b)(1)(A) referral violation is whether the Union arbitrarily departed from the referral procedures in effect at the Union's hiring hall. The Union's position before the Board and on appeal is that their actions comported with those referral procedures.

## THE "CALL–BACK" REFERRALS
## (SMITH AND HARRIS)

■ The Union claims that there was not substantial evidence to support a finding that the referrals of Smith and Harris were arbitrary departures from the hiring hall procedures. The Union insists that the bargaining agreement required the Union to refer those employees to the B.G. Danis Company because Danis' project superintendent, Maurey Black, had "called back" Smith and Harris. The Union does not deny that neither Smith nor Harris had been employed by Danis within the last six months. Thus, by the terms of the bargaining agreement, Danis was not entitled to request those two employees; Danis was only allowed to receive referrals under the customary procedure (*i.e.*, via the lists).

The Union contends that it had no choice in referring Smith and Harris. Union wit-

---

5. Section 8(b) reads:
     (b) It shall be an unfair labor practice for a labor organization or its agents—
     (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title ... [and]
     (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section....

The rights guaranteed in § 157 (§ 7 of the Act) include the right to refrain from forming, joining, or assisting labor organizations. Section 8(a)(3) makes it an unfair labor practice for an employer, "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...."

nesses Robert Rumgay, the Union's Secretary-Treasurer, and Orville Garland, a union steward, testified that Black said he would only accept Smith and Harris. Black testified, however, that Smith and Harris were "probably not" the only two he was willing to accept. The ALJ credited Black's testimony and discredited that of the Union witnesses, finding it inconsistent at points. This Court will not normally disturb the credibility assessments of the Board or the ALJ, who has observed the demeanor of the witness. *See NLRB v. Cement Transport, Inc.*, 490 F.2d 1024, 1029 n. 5 (6th Cir.), *cert. denied*, 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974).[6]

Even if we were to assume that the Union's testimony was more credible, it does not justify the Union's conduct. Under the contract, the Union was still required to follow the referral procedure. Black's testimony indicates that he thought he had the right to call back Smith and Harris. Had the Union referred other persons and explained why it was doing so, Black might have accepted the referred employees.[7] Even if he refused to accept the referred employees, it would be *his* obligation to make that rejection at that time, subject to any consequences of that rejection.[8] If, as the Union contends, the agreement would require Danis to pay anyone who is referred by the Union, that is a problem for the employer and not one for

the Union. The Union's response is that it would then be required to pursue the aggrieved employees' rights under the agreement, because the Union has a duty of fair representation. It is not too much to expect the Union to be prepared to represent the employees if the employer refuses to follow the agreement. The duty of fair representation certainly cannot be used by the Union as a justification for *its own* deviations from the agreement to the detriment of two of its own members.[9]

## THE STEWARD REFERRALS

## (LOGAN AND CRAWFORD)

With respect to the referrals of Crawford and Logan ahead of Thomas, the Union contends that because Crawford and Logan were referred to positions as union stewards, they could be referred at the discretion of the Union and separate from the normal referral process. The ALJ and the Board found that the agreement contained no such "steward exception" to the referral process and, further, that part of the reason Ross referred Logan was that Logan needed a few more weeks of employment to qualify for unemployment compensation. The Union does not deny that there was substantial evidence for the latter finding, nor does it contend that such a motivation was legitimate. Instead, the

**6.** The Union argues that credibility determinations are not immune from attack. However, those cases where the courts did not defer to credibility determinations involved the discrediting of *uncontroverted* evidence. *See e.g.*, *NLRB v. Howell Automatic Machine Co.*, 454 F.2d 1077 (6th Cir.1972). This case involves directly conflicting evidence. Furthermore, the Union's argument on this issue fails to focus on any particular credibility determination, nor are we told why the ALJ should have believed the Union's witnesses, or why he should have disbelieved the General Counsel's witnesses.

**7.** The fact that we cannot be sure whether Danis Co. would have accepted persons referred through the normal process is reason enough to require the Union to make such referrals and put the burden on the employer to actually accept or reject referrals.

**8.** The cases cited in the Union's brief to support its contention that it was required to fulfill

Black's request are inapposite. Those cases deal with employers who had a contractual right to call back the employees in question. *See Millwrights & Machinery Erectors, Local Union No. 2834*, 268 N.L.R.B. 150, 114 L.R.R.M. 1245 (1983); *International Ass'n of Heat and Frost Insulators and Asbestos Workers, AFL–CIO, Local 22*, 212 N.L.R.B. 913, 87 L.R.R.M. 1604 (1974).

**9.** The Union also asserts that it honored the employer's request for particular employees on the advice of Andy Schmidt, a Regional Agent of the Board. The Union offered no evidence of how informed Schmidt's advice was, and the ALJ did not hear from Schmidt directly. Furthermore, the evidence clearly demonstrated that the "advice" was received after the fact, and thus could not have been a basis for the Union's action.

Union chooses to focus on the steward exception.

■ In light of the Union's concessions with respect to the referral of Logan, there is substantial evidence to support the Board's finding that his referral violated the Act regardless of the existence of a steward exception to the referral process. By referring an employee for such an obviously impermissible reason, "the Union gives notice that its favor must be curried, thereby encouraging membership and unquestioned adherence to its policies." *Laborers and Hod Carriers Local No. 341 v. NLRB*, 564 F.2d 834, 840 (9th Cir.1977).[10]

■ The referral of Crawford, however, cannot be evaluated without considering the Union's position that there was a steward exception to the hiring hall process. The Union relies on two sources for this exception. First, it contends that Board precedent supports the exception. The cases the Union cites, however, address the question whether the operation of such an exception violates the Act. In those cases there was no dispute that such an exception was provided for in the collective bargaining agreement. Here, on the other hand, the critical issue is whether the agreement has such a provision. *Cf. District Council No. 2 of the Bhd. of Painters and Allied Trades*, 239 N.L.R.B. 1378, 100 L.R.R.M. 1152, 1153 (1979) (agreement provided that "the union shall have the power to appoint job or shop stewards and the Employer agrees to employ such persons appointed as stewards...."), *enf. denied*, 620 F.2d 1326 (8th Cir.1980); *Teamsters Local 959*, 239 N.L.R.B. 1387, 100 L.R.R.M. 1160, 1161 (1979) (agreement provided that "[t]he Job Steward may be the first person hired and/or dispatched at the Union's discretion.").

The Union's second source for its position that there is a steward exception is the testimony of Ross that the Union practice for the past thirty years has been to refer stewards separate from the normal referral process and to refer only experienced stewards. This testimony was uncontroverted, and the ALJ quoted from it in his findings of facts. Despite such testimony, the ALJ's only discussion of the possible existence of a steward exception was the following:

> Further, business manager Ross' shifting attempt to justify this referral out-of-turn by calling Logan the "steward" is also improper. The steward provisions of the pertinent agreement (Art. X) do not provide for such an exception to the referral procedures (Art. II). In any event, the appointment of a steward cannot be used as a device to evade specific referral procedures.

The ALJ's discussion of the steward exception indicates that he confined his analysis to the "four corners" of the agreement. Such an approach is erroneous in the labor agreement context.

> [L]abor agreements are not considered to be, or construed as, ordinary commercial contracts. A collective bargaining compact must be interpreted in light of the "common law" of the shop—a composite of the history and practices of the industry and the disputing company and union. *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564 [80 S.Ct. 1347, 4 L.Ed.2d 1409] (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 [80 S.Ct. 1347, 4 L.Ed.2d 1409] (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 [80 S.Ct. 1358, 4 L.Ed.2d 1424] (1960).

*Boldt v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America*, 482 F.2d 985, 989 (Temp.Emer.Ct.App.1973); *see also Local No. 742, United Bhd. of Carpenters and Joiners of America v. NLRB*, 444 F.2d 895 (D.C.Cir.), *cert. denied*, 404 U.S. 986, 92 S.Ct. 447, 30 L.Ed.2d 371

---

**10.** Furthermore, we note that the selection of Logan probably could not have withstood a § 8(b)(1)(A) challenge, even if there was a steward exception, in light of the fact that at the time Logan was referred as steward to Chicago Bridge and Iron (CBI) there were no other laborers on that employer's payroll.

(1971). Thus, even though the steward exception was not explicitly stated in the agreement, the ALJ and the Board could have found that the law of the shop governed the selection of stewards. Because the agreement did not explicitly reverse the thirty-year-old practice of selecting stewards, and because neither the ALJ nor the Board discussed the relevance of that practice in light of the above quoted rule of interpretation, we cannot accept the Board's conclusion that the selection of Crawford ahead of Thomas violated section 8(b)(1)(A). We will refuse to enforce this portion of the Boards' order, and will remand this portion of the proceeding to the Board for its consideration of whether the collective bargaining agreement here incorporated the thirty-year practice as part of the common law of the shop.

### THE COERCION FINDING

The Board also found that the Union violated section 8(b)(1)(A) of the Act by threatening reprisals against persons who filed unfair labor practice charges. We must decide whether the Board's findings are supported by substantial evidence. The Board based its holding on a statement by Union president Larry Rice to thirty or forty applicants present in the hiring hall one night in September 1983. The substance of his comments was that filing unfair labor practice charges would lead to an investigation that might result in members losing their unemployment compensation for turning down work. He said that it could hurt "a whole lot of people."

The Union's position is that Rice told the members that they could go ahead and file the charges if they liked, and that Thomas and Baldwin did not understand this to be a threat against them because they had already filed charges. The latter point is based on the mistaken assumption that the Board was solely concerned with the effect of the statements on Thomas and Baldwin. The Board indicated that its real concern was with the effect of the statements on those employees who had not yet filed charges. There can be no quarrel with the Board's conclusion that it would discourage

them from filing charges. The issue, however, is whether Rice's statements, which predicted non-Union-caused consequences of filing unfair labor practice charges, violate the Act's prohibition against coercing employees in the exercise of their section 7 rights.

The cases relied on by the General Counsel to support the Board's finding of coercion deal with unions that punished members who filed charges, *NLRB v. Industrial Union of Marine and Shipbuilding Workers of America*, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968), *NLRB v. Local 212, Int'l Union*, 690 F.2d 82 (6th Cir. 1982), or unions that threatened to punish members if they did file such charges, *NLRB v. Service Employees Int'l Union, Local 254*, 535 F.2d 1335 (1st Cir.1976). Here, although the ALJ found that the Union "clearly threatened employee members with reprisals if they filed charges with the Board," the Union itself would not have been the source of the threatened reprisals. The ALJ apparently considered the threatened reprisals to be the loss of unemployment benefits which might result through action by appropriate state agencies possibly alerted by the Board or the employer association.

■ It is undisputed that the Union did not explicitly threaten that *it* would take some action against persons who file unfair labor practice charges. Rather, the action threatened was action that would have been taken by an independent third party with no instigation or assistance from the Union. Nor did the Board find that there was some implied threat that the Union or its members would take some action against persons who file charges. Finally, the Board did not find that Rice's statements were false; thus, there is no reason to suspect that he overstated the risk to the Union members of filing unfair labor practice charges. In light of these facts and findings, we are unable to sustain the Board's holding that Rice's speech violated the Act.

Our decision on this issue hinges on the definition of "coerce" in section 8(b)(1)(A). The legislative history of the provision is instructive. Section 8(b)(1)(A) of the Act was modeled after section 8(a)(1) which makes it unlawful for an employer "to interfere with, restrain or coerce employees in the exercise" of their section 7 rights. Section 8(b)(1), however, does not contain the words "interfere with." The proposed legislation originally contained those words, but they were deleted because they might be "construed to mean that any conversation, any persuasion, any urging on the part of any person, in an effort to persuade another to join a labor organization, would constitute an unfair labor practice." 93 Cong.Rec. 4270 (1947), 2 Legislative History of the Labor Management Relations Act 1138 (1948) (remarks of Senator Ives). The Supreme Court has interpreted the legislative history surrounding the deletion of the words "interfere with," and concluded that the act was meant to reach "reprehensible" practices, "but not methods of peaceful persuasion." *NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639*, 362 U.S. 274, 286, 80 S.Ct. 706, 713, 4 L.Ed.2d 710 (1960). "[Section] 8(b)(1)(A) is a grant of power to the Board limited to authority to proceed against union tactics involving violence, intimidation, and reprisal or threats thereof...." *Id.* at 290, 80 S.Ct. at 715. This distinction between persuasion and coercion is explicitly legislated in section 8(c) of the Act.

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c).

When a Union has merely objectively informed employees of those consequences of the employees' actions that are beyond the Union's control, no section 8(b)(1)(A) violation has occurred. The Union is informing, and perhaps persuading, but it is not threatening reprisal. Language from a section 8(a)(1) case is instructive.

[T]he Labor Board must in the first instance perform the extremely delicate task to [sic] distinguishing employer coercion from employer persuasion.

A consideration of the vagaries of this task compels us to suggest to the Board the beginnings of a principled approach to distinguishing coercion from persuasion. This approach, it would seem, is also instructive on the similarly delicate issue of whether a statement is a "prediction" or a "threat of retaliation." A § 8(a)(1) violation based on speech alone is made out solely by reference to imminent coercive actions. Speech which carries a message of actual coercion is more than pure speech and thus is subject to balance with other important social interests. The Congress has concluded that the right of workers to freely associate for their economic betterment is of more social importance than the employer's free speech rights *when that speech is backed by a threat of action.* The Supreme Court has let that judgment stand. But coercion must surely be interpreted to mean more than a persuasive argument that certain events will occur which are distasteful *to the listener.* Rather, coercion is defined by reference to the will of the speaker—does the speaker intend to perform an act for no other reason than that the listener is in favor of the union? Of course, the speaker's intent must be inferred from the circumstances as they appear to the reasonable person. Thus, to take examples from a recurrent § 8(a)(1) problem, employer assertions that "serious harm" will result from unionization are generally not an unfair labor practice while assertions that the employer will "bargain from scratch" are unfair labor practices.

*Chauffeurs, Teamsters and Helpers, Local 633 of New Hampshire v. NLRB,* 509 F.2d 490, 495–96 (D.C.Cir.1974) (first emphasis added).

Other cases from the election campaign context support our holding that a predic-

tion of consequences beyond the Union's or employer's control are not "coercive" as that word is used in sections 8(a)(1) and 8(b)(1) of the Act.[11] Those cases draw the line between coercion (threatened retaliation) and protected speech at the point where the predicted consequence will occur because the company wants to bring it about in order to punish the workers for going against the company's wishes. *See NLRB v. Village IX, Inc.,* 723 F.2d 1360, 1367 (7th Cir.1983); *Automated Business Systems v. NLRB,* 497 F.2d 262 (6th Cir. 1974); *NLRB v. Harry F. Berggren and Sons, Inc.,* 406 F.2d 239, 243–44 (8th Cir.), *cert. denied,* 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 74 (1969); *NLRB v. Grand Foundries, Inc.,* 362 F.2d 702, 707–08 (8th Cir. 1966). There is no reason to assume that Congress meant to draw the line differently in section 8(b)(1)(A) to prevent a union from informing employees that filing an unfair labor practice claim will detrimentally affect those employees in a manner beyond the control of the union.[12]

For the reasons stated above, we affirm the Board's findings that Harris, Smith and Logan's referrals constituted arbitrary departures from the hiring hall referral procedures in violation of sections 8(b)(1)(A) and 8(b)(2) of the Act. We reverse the findings that the referral of Crawford and the speech by Rice violated those provisions of the Act.

The case is remanded to the Board for modification of its order such that it is consistent with this decision and, in the discretion of the Board, for further proceedings with respect to the construction of the collective bargaining agreement in light of the common law of the shop.

**11.** Cases interpreting the meaning of "coerce" in § 8(a)(1) are instructive here because Congress intended to impose the same restrictions on unions that the Act imposes on employees with respect to the violation of employee rights. *International Ladies Garment Workers' Union v. NLRB,* 366 U.S. 731, 738, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961).

**12.** As we noted above, our decision does not reach the issue of what evidence is sufficient to support a finding that a union prediction of

actions of an independent third party contains an implied threat that the union or its agents will retaliate against employees who file unfair labor practice charges. Nor do we consider whether such a prediction, in the presence of other employees who stand to suffer the predicted consequences, can be coercive in that it signals the other employees to retaliate. The Board's decision was not based on such findings.