*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0128p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NATIONAL LABOR RELATIONS BOARD,
  *Petitioner/Cross-Respondent,*

  *v.*

Nos. 05-1579/1639/1714

LOCAL 334, LABORERS INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO; KVAERNER SONGER, INC.,

  *Respondents/Cross-Petitioners.*

>

On Application for Enforcement and Cross-Petition for Review
of an Order of the National Labor Relations Board.
Nos. 7-CA-13458; 7-CB-13458.

Argued: July 28, 2006

Decided and Filed: April 6, 2007

Before: MOORE and GIBBONS, Circuit Judges; ACKERMAN, District Judge.[*]

---

## COUNSEL

**ARGUED:** David Seid, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner. J. Douglas Korney, Farmington Hills, Michigan, Jeffrey E. Beeson, BEESON TERHORST, Santa Rosa, California, for Respondents. **ON BRIEF:** David Seid, Meredith L. Jason, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner. J. Douglas Korney, Farmington Hills, Michigan, Jeffrey E. Beeson, BEESON TERHORST, Santa Rosa, California, for Respondents.

---

## OPINION

---

JULIA SMITH GIBBONS, Circuit Judge. The National Labor Relations Board ("NLRB" or "Board") seeks enforcement of an order that directs Local 334, Laborers International Union of North America, AFL-CIO, ("Local 334") and Kvaerner Songer, Inc., ("Kvaerner") to cease and desist unfair labor practices and interference with employees' rights under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.* Local 334 and Kvaerner cross-petition for review

---

[*]The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

of the NLRB's order.  For the following reasons, we deny Local 334's and Kvaerner's petitions for review and enforce the NLRB's order.

I.

The NLRB issued a consolidated complaint against Local 334 and Kvaerner, alleging that the Local 334 violated §§ 8(b)(1)(A) and 8(b)(2) of the NLRA and that Kvaerner violated §§ 8(a)(1) and 8(a)(3).  29 U.S.C. § 158.  The complaint stemmed from charges brought by six members of Local 334 who claimed that Local 334 caused Kvaerner to terminate their employment or refuse to hire them and that Kvaerner acceded to the union's unlawful demands.  The alleged violations of the NLRA took place in September 2002 at a Kvaerner job site at the National Steel Corporation's Zug Island facility in Ecorse, Michigan.

National Steel Corporation contracted with Kvaerner to repair a blast furnace at the Zug Island facility in the fall of 2002.  Work on the project commenced on September 3 and was governed by the National Maintenance Agreement ("NMA").  The NMA is a collective bargaining agreement adopted by fourteen international unions and applied to industrial maintenance and renovation work performed throughout the United States.  The NMA "is a stand alone agreement and none of the provisions in any local, regional, area or national collective bargaining agreement . . . apply, unless" the NMA specifically incorporates them.  The NMA does not incorporate local collective bargaining agreements with respect to hiring.  However, Article XIX, section 1, of the NMA does provide:

> The Employer agrees to hire craftworkers in any territory where work is being performed or is to be performed in accordance with the hiring procedure existing in the territory where the work is being performed, or is to be performed; however, in the event the Local Union is unable to fill the request of the Employer for employees within a forty-eight (48) hour period after such request for employees (Saturday, Sundays and Holidays excepted), the Employer may employ workmen from any source . . . .

Kvaerner began efforts to staff the Zug Island job on August 30, 2002.  Tony Peace, the superintendent of the project, asked Timothy Rushlow, a manager at a local Kvaerner office, to hire five laborers to begin work on the project on September 3.  Peace charged Rushlow with hiring the first workers because Rushlow, unlike Peace, was familiar with the hiring procedures in the area.

Rushlow first attempted to hire laborers through referrals from Local 334.  He called the union on August 30, which was the Friday prior to Labor Day, but he could not reach a union official.  He left cell phone messages for two union officials, but they did not return his calls.  On Tuesday morning, the day work on the project was supposed to begin, Rushlow called Clyde O. Escobar, III.  Escobar, who was a member of Local 334, had worked with Rushlow on a previous project.  Rushlow directly offered Escobar a job on Kvaerner's Zug Island project, without referral from the union, and asked Escobar to find four laborers to work with him on the project.

Escobar offered the Kvaerner job to four other Local 334 members: Jesus Alcorta, Rene Gregario Ramos, Eric Garza, and Sergio Garza.  All five of the men reported to the Kvaerner job site where they were met by Peace and Jeff Tackett, a business agent for Local 334.  Tackett had told Peace: "[Local 334] suppl[ies] all the men on these jobs [and y]ou just can't hire anybody you feel like hiring.  [I do not] know where these guys came from . . . .  If you hire them, I am going to file a grievance."  Because Peace "[didn't] want any problems," he told the five men that he could not hire them and asked Local 334 to supply the laborers for the project.

Local 334 contacted laborers who were hired by Kvaerner as they arrived on the job site throughout the day on September 3.  One of the laborers hired was Realius Trammell.  After his first

day at work, Trammell contacted his friend, Michael Wilson, and told him that Kvaerner was hiring for the Zug Island project. Wilson went to the job site the following day where he was met by Kvaerner supervisor, Andre Laurain. Laurain hired Wilson after Wilson, who is a member of Local 334, represented that he was "from the Hall." Approximately half an hour after hiring him, when Wilson was in Kvaerner employee orientation, Laurain fired him. Laurain told Wilson "I have to let you go" because "I talked to union business manager[, Scott] Covington" and "[h]e does not want you out here, and [he] calls the shots."

After his dismissal, Wilson filed an unfair labor practice charge against Kvaerner and Local 334. The five men that Kvaerner initially refused to hire at Local 334's insistence—Alcorta, Escobar, E. Garza, S. Garza, and Ramos—also filed unfair labor practice charges. The NLRB's General Counsel consolidated their charges and filed a complaint against Local 334 and Kvaerner. An Administrative Law Judge ("ALJ") recommended dismissing the complaint because he found that Local 334 was operating an exclusive hiring hall with respect to Kvaerner's project at Zug Island and that the discrimination practiced by Local 334 in the operation of the hiring hall did not run afoul of the NLRA. The General Counsel filed exceptions to the ALJ's decision with the NLRB. On review, the NLRB found them meritorious and reversed the ALJ. The NLRB found that Local 334 did not operate an exclusive hiring hall for the Zug Island project because Local 334 members testified that they commonly gained employment through their own efforts without referral from the union. Therefore, the NLRB concluded that Local 334 violated the NLRA by pressuring Kvaerner either to not hire or terminate Alcorta, Escobar, E.Garza, S. Garza, Ramos, and Wilson ("the Complaining Employees") and that Kvaerner violated the NLRA by caving to Local 334's pressure. The NLRB issued the order of which it now seeks enforcement, and Local 334 and Kvaerner seek review.

II.

Pursuant to 29 U.S.C. § 160(e), this court reviews the factual determinations made by the NLRB under the substantial evidence standard. *Dupont Dow Elastomers, L.L.C. v. NLRB*, 296 F.3d 495, 500 (6th Cir. 2002). The deferential substantial evidence standard requires this court to uphold the NLRB's factual determinations if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368 (6th Cir. 1993), *abrogated on other grounds by NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115 (6th Cir. 1997). This is true even if the NLRB and the ALJ relied on the same facts to reach different conclusions. "Our deference to findings of fact runs in favor of the Board, not in favor of the ALJ." *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995). "However, the ALJ's findings are part of the record we must review[,]" and therefore we must take them into account to the extent that they reduce the weight of the evidence supporting the NLRB's conclusion. *Id.* Essentially, a conflict between the NLRB and the ALJ requires us to review the evidence more carefully to determine if the NLRB's conclusion is supported by substantial evidence, but otherwise "[t]he 'substantial evidence' standard is not modified in any way when the Board and [the ALJ] disagree." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951); *see also W.F. Bolin*, 70 F.3d at 870-71.

The substantial evidence standard does not apply to the NLRB's legal conclusions or its interpretation of the collective bargaining agreement that governs the relations between a union, an employer, and its employees. We undertake a *de novo* review of the NLRB's conclusions of law, *Dupont*, 296 F.3d at 500, and interpretations of contract terms, *Gratiot Cmty. Hosp. v. NLRB*, 51 F.3d 1255, 1261 (6th Cir. 1995). However, "the court will uphold the Board's reasonable interpretation of the NLRA where Congress has not spoken to the contrary on the same issue." *Dupont*, 296 F.3d at 500.

### III.

Section 8 of the NLRA provides in relevant part:

(a) Unfair labor practices by employer
It shall be an unfair labor practice for an employer--
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [section 7 of the NLRA]; . . .
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

(b) Unfair labor practices by labor organization
It shall be an unfair labor practice for a labor organization or its agents--
(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title [section 7 of the NLRA] . . .
(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership is such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; . . . .

29 U.S.C. § 158.  Section 7 of the NLRA provides:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157.  The NLRA "deals with discrimination either by the employers or unions that encourages or discourages union membership." *Local 357, Int'l Bhd. of Teamsters v. NLRB*, 365 U.S. 667, 674 (1961).  "'[T]his section does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited. Nor does this section outlaw discrimination in employment as such; only such discrimination as encourages or discourages membership in a labor organization is proscribed.'"  *Id.* at 674-75 (quoting *Radio Officers' Union of Commercial Telegraphers Union v. NLRB*, 347 U.S. 17, 42-43 (1954), regarding § 8(a)(3) of the NLRA).

Consequently, hiring halls, arrangements in which an employer obtains employees through referrals from a union, are not illegal under the NLRA, despite their encouragement of union membership.  *Id.* at 675-76.  They are a matter of negotiation between the parties, and the NLRB has no power to compel the inclusion or exclusion of hiring halls in collective agreements.  *Id.* at 676.  When a collective agreement calls for an exclusive hiring hall, under which an employer exclusively hires employees referred by the union, the employer or union may enforce the terms of the agreement against a union member unless the hiring hall is administered in a discriminatory or arbitrary fashion.  *Id.* at 675; *NLRB v. Constr. & Gen. Laborers' Union Local No. 534*, 778 F.2d 284, 287 (6th Cir. 1985); *Local Union No. 948, Int'l Bhd. of Elec. Workers v. NLRB*, 697 F.2d 113, 116 (6th Cir. 1982).  Conversely, when no collective agreement for a hiring hall exists, the employer or union cannot require a prospective employee to use the hiring hall because there is no agreement

to enforce. *Laborers' Int'l Union, Local No. 83 v. NLRB*, 497 F.2d 1337, 1338 (6th Cir. 1974); *NLRB v. Teamsters Local Union No. 676*, 419 F.2d 1274, 1274-75 (3d Cir. 1969). Because the ability to enforce the use of a hiring hall by prospective employees is determined by the terms of the collective agreement, once the NLRB has demonstrated discriminatory conduct which could have affected employee rights, the burden shifts to the employer or union to show that its actions were authorized by the agreement. *Local 83*, 497 F.2d at 1338-39.

Applying this reasoning, an employer or union violates the NLRA if it denies employment to a prospective employee because that prospective employee was not referred by a nonexclusive hiring hall. Under an agreement providing for a nonexclusive hiring hall, prospective employees are free to seek employment through means other than the hiring hall, and employers are not restricted to hiring persons recommended by the union. *See Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 71 (1989). Requiring a union member to use the hiring hall when other prospective employees are not similarly encumbered is both arbitrary because it departs from the referral procedures in effect at the hiring hall, as defined by the agreement, *see Local 534*, 778 F.2d at 287, and discriminatory because it places different requirements on members and nonmembers, *see Local 948*, 697 F.2d at 116. By punishing an employee for "such an obviously impermissible reason, 'the Union gives notice that its favor must be curried, thereby encouraging membership and unquestioned adherence to its policies.'" *Local 534*, 778 F.2d at 289 (quoting *Laborers & Hod Carriers Local No. 341 v. NLRB*, 564 F.2d 834, 840 (9th Cir. 1977)). The employer or union cannot satisfy its burden of showing that its actions were authorized by the agreement because the agreement contains no exclusivity requirement to enforce. Therefore, an employer or union cannot require a prospective employee to utilize a nonexclusive hiring hall.

As it is undisputed that Local 334 caused and Kvaerner acquiesced to the firing of the Complaining Employees because they were not referred from the hiring hall, the disposition of this case hinges upon the factual determination of whether an exclusive or nonexclusive hiring hall arrangement existed. Whether a union and employer have an exclusive hiring hall arrangement is determined by looking at the totality of the circumstances present in the case, including the contract between the union and employer, the interpretation of that contract by the parties, and the hiring practices followed by the union and employer. *Local Union No. 174, Int'l Bhd. of Teamsters (Totem Beverages, Inc.)*, 226 N.L.R.B. 690, 690 (1976).

Here, the NLRB's finding that Local 334 and Kvaerner did not have an exclusive hiring hall arrangement is supported by substantial evidence. The totality of the circumstances presented to the Board revealed that Local 334 was a source of labor but not the exclusive source. The NMA suggests that employers operating under it will contact the local unions for employees as evidenced by the provision that permits the employer to locate another labor source if the local union cannot fill its labor needs within forty-eight hours. This provision, however, does not create an exclusive hiring hall arrangement because the NMA also defers to local hiring practices. It provides that employers shall hire in accordance with the hiring practices in the localities where their work is performed. This provision mandated Kvaerner to follow the hiring practices used in the Ecorse, Michigan, area. Therefore, whether Local 334 traditionally operated an exclusive hiring hall for employers working in the area determined whether, under the NMA, it had an exclusive hiring hall arrangement with Kvaerner.

The hiring practices developed by Local 334 and its members were not consistent with an exclusive hiring hall arrangement. The union members who filed the grievances in this case testified that they commonly sought and secured their own employment and that Local 334 knew that they obtained jobs without referral from the union. Moreover, employers obtaining labor in the area did not rely on Local 334 to supply employees. Rushlow, a manager at Kvaerner's area office, testified that Kvaerner "usually" obtained laborers through Local 334, but he was never required to use Local 334 as an exclusive source of labor and staffed projects by contacting potential employees directly,

as he did in this case. In fact, Rushlow was charged with staffing the Zug Island project because he was aware of local hiring practices. Therefore, his failure to treat Local 334 as an exclusive hiring hall is strong evidence that an exclusive hiring hall arrangement had not developed in practice. Furthermore, the record contains no contrary evidence suggesting that Local 334 functioned as an exclusive hiring hall under local hiring practices.

Finally, as the NLRB concluded, the hiring practices developed at the Zug Island project after the charging parties were denied employment is not determinative of the hiring practices at the time the charging parties were denied employment. The time period when the parties were denied employment, roughly September 3 and 4, 2002, was the relevant time period for determining the local hiring practices existing when Kvaerner staffed the project. The NMA requires employers to act in accordance with the hiring practices *existing* in the area at the time of the hiring decision. It was proper for the NLRB to give weight to the evidence that the parties' arrangement was nonexclusive during the relevant time period. *Cf. NLRB v. Philadelphia Iron Works, Inc.*, 211 F.2d 937, 940 (3d Cir. 1954) (noting that hiring practices after a grievance was filed "would be a factor for the board's consideration" but that the NLRB easily could reason that subsequent hiring practices were reactionary to the grievance and did not accurately reflect the prior hiring arrangement).

The record contains substantial evidence to support the NLRB's conclusion that Local 334 and Kvaerner did not have an exclusive hiring hall arrangement. This factual finding in turn dictates the conclusion that Local 334 and Kvaerner violated the NLRA. In the absence of an exclusive hiring hall arrangement, Local 334 was not entitled to compel Kvaerner to hire only the union's referrals, and Kvaerner was not justified in acquiescing to the union's hiring demands.

IV.

For the foregoing reasons, we enforce the NLRB's order against Local 334 and Kvaerner.