NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0521n.06
No. 19-5673

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Plaintiff-Appellee*, | ) | **FILED**<br>Sep 04, 2020<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| KIMBERLY JONES, | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| *Defendant-Appellant*. | ) | KENTUCKY |
| | ) | |

Before: BATCHELDER, STRANCH, and MURPHY, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** A jury convicted Kimberly Jones, a registered pharmacist, of knowingly dispensing Schedule II controlled substances outside the scope of professional practice and not for a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1). Jones appeals her conviction, arguing that there was insufficient evidence to support it and that the district court erred by allowing an unqualified expert named Taylor Carr to testify for the government. Both claims are meritless, and we therefore **AFFIRM.**

**I.**

Jones owned and operated Kim's Hometown Pharmacy (KHP) in Williamsburg, Kentucky. In 2017, the Drug Enforcement Agency (DEA) learned that KHP had filled large quantities of prescriptions for controlled substances from several out-of-state doctors who had been investigated and indicted on criminal charges based on their medical practices. The DEA conducted an audit

1

of KHP's inventory for the period between December 31, 2015 and August 3, 2017: 869 oxycodone 30mg pills and 1,882 hydrocodone 10mg pills were unaccounted for.

The DEA's subsequent investigation revealed that KHP had filled thousands of out-of-state prescriptions from numerous different doctors for large quantities of Schedule II controlled substances such as oxycodone, oxymorphone, and hydrocodone. *See* 21 U.S.C. §§ 802(6), 812. It appeared that KHP had developed a regular clientele with the same customers filling multiple out-of-state prescriptions every year. One of KHP's regulars, Leslie Meadows, received varying dosages of oxycodone and oxymorphone between 2010 and 2017, which had been prescribed by twenty-eight different doctors in fifteen cities across five states.

Despite these unusual patterns, Jones had failed to regularly use Kentucky's All Schedule Prescription Electronic Reporting (KASPER) system, a database that allows prescribers and pharmacists to monitor patients' prescription histories. Pharmacists are not legally required to use KASPER; it is an optional tool to help pharmacists combat "doctor shopping" and "overprescribing." R. 109, PageID: 1111, 1114. Nonetheless, Jones never ran a KASPER report on Meadows. In fact, from 2014 to 2018, Jones generated reports on only about nine KHP customers. Moreover, some KHP customers reported that Jones never asked them about their medical histories, even though they paid hundreds of dollars in cash for their out-of-state prescriptions. Indeed, KHP had a reputation among opioid addicts as a "convenient" place to fill out-of-state prescriptions. R. 108, PageID: 843–44.

DEA investigators also found that Jones had "loaned" pills to customers without valid prescriptions. "Pill loaning" is a three-step process: (1) a customer runs out of pills early; (2) the pharmacist loans the number of pills necessary for the customer to reach his next refill date; and (3) the pharmacist subtracts the number of loaned pills from the customer's prescription refill. DEA investigators recovered handwritten and electronic notes from KHP's records that referenced

pill loaning. And a second audit of KHP's inventory from December 2015 to March 2018 revealed an even higher number of missing controlled substances than had been found in the first audit.

DEA investigators met with Jones several times throughout the investigation. During questioning about the pill shortage, her story changed several times. After denying that she had ever loaned pills, Jones said she could not remember which customers had borrowed pills from KHP. But Jones later identified some customers who had borrowed pills, admitting that she would loan pills "if she knew the doctor was going to write a refill or if the prescription was going to fall on a Saturday" and "she wanted to provide pills for the patient for the weekend." R. 108, PageID: 924.

Jones also told DEA investigators that she suspected her former employee, Jeff Holmes, of stealing pills. At the time of the DEA's investigation, Holmes worked at another pharmacy. Jones told investigators that she had spoken to Holmes's supervisor who reported that several pills were stolen. Investigators later learned that Jones had called Holmes's supervisor in the fall of 2017. Jones had asked the supervisor if he suspected Holmes of stealing any drugs; the supervisor had responded in the negative.[1]

A federal grand jury charged Jones with thirty-five counts of knowingly and intentionally distributing Schedule II controlled substances outside the scope of professional practice and not for a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1). After an eight-day trial, a jury convicted her of seven counts of unlawfully dispensing Schedule II controlled substances.[2] Counts 5 and 6 were based on two prescriptions that Jones filled for Leslie Meadows; Counts 30–35 were based on pill loaning. After the district court denied Jones's Rule 29 motion for judgment

---

[1] Jones accused another employee, Gary McPherson, of stealing pills in May 2018. The government investigated, and McPherson was subsequently convicted of stealing from KHP.

[2] The remaining counts charged Jones with maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1), and health-care fraud in violation of 18 U.S.C. § 1347. The jury acquitted her of these charges.

of acquittal, Jones appealed, arguing that the evidence was insufficient to support her conviction and that the district court erred by allowing an unqualified expert to testify.

## II.

Jones argues that the government failed to introduce sufficient evidence to sustain her convictions under 21 U.S.C. § 841(a)(1). In reviewing sufficiency-of-the-evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It is the jury's responsibility, not ours, to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.*

The Controlled Substances Act (CSA) makes it unlawful for any unauthorized person to knowingly[3] distribute or dispense Schedule II controlled substances, such as oxycodone, oxymorphone, and hydrocodone. *See* 21 U.S.C. § 841(a)(1). Pharmacists are protected from liability so long as they dispense controlled substances pursuant to the CSA's implementing regulation, which provides:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a *corresponding responsibility rests with the pharmacist who fills the prescription*. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

---

[3] The mens-rea requirement is "knowingly or intentionally." § 841(a). But the term "intentionally" is often omitted from the list of elements. *See* Sixth Cir. Crim. Pattern Jury Instr. 14.02A (updated as of July 1, 2019), https://www.ca6.uscourts.gov/sites/ca6/files/documents/pattern_jury/pdf/crmpattjur_full.pdf.

21 C.F.R. § 1306.04(a) (emphasis added).

The regulation's "corresponding responsibility" language prohibits pharmacists from filling prescriptions if they have reason to know that the prescriptions were not issued for legitimate medical purposes. *See United States v. Veal*, 23 F.3d 985, 988 (6th Cir. 1994) (per curiam); *United States v. Hughes*, 895 F.2d 1135, 1143 n.11 (6th Cir. 1990). Reasonable measures include "paying attention to the 'number of prescriptions issued, the number of dosage units prescribed, the duration and pattern of the alleged treatment,' the number of doctors writing prescriptions and whether the drugs prescribed have a high rate of abuse." *Med. Shoppe-Jonesborough v. Drug Enf't Admin.*, 300 F. App'x 409, 412 (6th Cir. 2008) (quoting *Ralph J. Bertolino Pharmacy, Inc.*, 55 Fed. Reg. 4,729, 4,730 (Feb. 9, 1990)).

Accordingly, to have convicted Jones under § 841(a)(1), the jury must have found that Jones filled prescriptions for Schedule II substances knowing that the prescriptions were outside the scope of professional practice and that they were not for a legitimate medical purpose. *See Veal*, 23 F.3d at 987–88. "To prove the requisite knowledge, the government [is] required to show, at a minimum, that the defendant deliberately closed [her] eyes to wrongdoing that should have been obvious to [her]." *Id.* So, for Counts 5 and 6–the invalid-prescription counts—the government must have sufficiently shown that Jones knowingly filled prescriptions for Leslie Meadows that were not being used for a legitimate medical purpose. And for Counts 30–35—the pill-loaning counts—the government must have sufficiently shown that pill loaning falls below the professional standard of pharmaceutical practice and that Jones knowingly loaned pills to customers without prescriptions.

A. *Jones knowingly filled invalid prescriptions for Meadows.*

The government showed that Jones knowingly filled invalid prescriptions for Leslie Meadows. Two expert pharmacists—Katie Busroe and Paula York—testified regarding the

5

professional standard of pharmaceutical practice. They testified that there are common "red flags" that indicate prescription-drug abuse, including out-of-state prescriptions, frequent changes of prescribers, long-term use of certain combinations of pills, and payment in large sums of cash. *See* R. 109, PageID: 1173; R. 111, PageID: 1500–14. Busroe and York opined that Jones failed in her professional responsibility by repeatedly ignoring red flags raised by Leslie Meadows's prescription history.

Jones contends that she filled Meadows's prescriptions in good faith. She says that a deviation from the professional standard of care cannot alone establish a knowing mens rea, arguing that the evidence "leaves open the possibility that [Jones] made an error in judgment or [that she] simply committed negligence." Appellant Br. at 13. A pharmacist's claim of good-faith compliance with proper pharmaceutical practice is judged by an objective standard, *see, e.g.*, *Veal*, 23 F.3d at 988, which asks "whether a reasonable [pharmacist] under the circumstances could have believed, albeit mistakenly, that [s]he had acted within the scope of ordinary professional medical practice for a legitimate medical purpose," *see United States v. Godofsky*, 943 F.3d 1011, 1026 (6th Cir. 2019).

The volume of Schedule II painkillers dispensed by KHP to Meadows over the course of seven years—roughly 12,000 pills in varying quantities prescribed by twenty-eight out-of-state doctors—belies Jones's claim of good-faith compliance with professional standards. Expert testimony asserted that any reasonable pharmacist would have been suspicious of Meadows's long pharmaceutical history, which included out-of-state prescriptions for oxycodone and oxymorphone—a highly addictive combination of pills typically prescribed for short-term use after a traumatic accident or for end-of-life care. *See* R. 110, PageID: 1252 (explaining that Schedule II drugs "are the most misused, most abused, most addictive legal drugs that we have in the United States"). Despite these patterns, Jones failed to take basic precautionary measures to confirm the

validity of Meadows's prescriptions, such as running KASPER reports. A reasonable juror could easily conclude that Jones failed to act in good faith compliance with the regulations when she filled his prescriptions.

Jones points to testimony from Rebecca Meadows, Leslie Meadows's wife, who testified that she was "good friends" with Jones. R. 110, PageID: 1300, 1310. Mrs. Meadows admitted that her husband was addicted to painkillers but said that Leslie had "real pain issues" and "still" experienced pain at the time of Jones's trial. *Id.* at 1307. Jones argues that, given her friendship with Mrs. Meadows, it follows that Jones "would be aware of Leslie's medical problems causing him to need Schedule II drugs." Appellant Br. at 14. But a juror could also conclude from these facts that Jones was aware of Leslie Meadows's addiction to painkillers. That inference, in addition to Meadows's long prescription history, is sufficient for reasonable jurors to find the requisite mens rea: "that [Jones] deliberately closed [her] eyes to wrongdoing that should have been obvious to [her]." *See Veal*, 23 F.3d at 988

B. *Jones knowingly loaned pills to customers without prescriptions.*

Jones concedes that she loaned Schedule II drugs to five customers without prescriptions. But she says that the government failed to show that she knowingly loaned pills for illegitimate purposes. Again, the question is whether any reasonable juror could have found that Jones failed to make an objective, good-faith attempt to comply with professional pharmaceutical practice. *See Godofsky*, 943 F.3d at 1026.

The CSA provides that no Schedule II controlled substances "may be dispensed without the written prescription of a [prescriber]." 21 U.S.C. § 829(a). The government presented ample evidence regarding the professional standard of care regarding pill loaning. Busroe and York explained that loaning pills was not a matter of pharmaceutical discretion and "that a prescription has to be presented before it can be filled for a controlled substance." R. 111, PageID: 1495; *see*

R. 109, PageID: 1165.  Another pharmacist, Samuel Moore, agreed with the experts' assessment, testifying that pharmacists should "never" loan Schedule II controlled substances to customers without prescriptions.  R. 109, PageID: 1125.  A former pharmacy technician at KHP—April Bryant—said that even non-pharmacist employees know that "you're not supposed to give out medications without a prescription."  *Id.* at 1071.  The jury also heard testimony about KHP's pill shortages, Jones's notes referencing pill loaning, and Jones's attempt to mislead investigators by blaming the missing pills on Jeff Holmes, her former employee.  A juror could reasonably conclude from the evidence presented that Jones knowingly violated professional standards by loaning pills to customers without prescriptions.

Jones contends that Busroe's and York's expert opinions are "not probative of [Jones's] actual mental state at the time of pill loaning" and that the "net effect of the expert testimony" amounted to a "strict liability criminal standard of a practice that occurs in pharmacies every day."  Appellant Br. at 16.  This argument fails for several reasons.  First, Busroe's and York's testimony was not the only evidence of a knowing mens rea; a reasonable juror could have inferred knowledge through the other evidence presented.  Second, Jones has not challenged the district court's jury instructions regarding § 841(a)(1)'s knowledge requirement.  Nor has she developed any argument regarding the inadmissibility of Busroe's and York's expert testimony.  Her strict-liability argument is therefore meritless.  In any event, Busroe and York testified about "the requirements of federal regulations and what the routine practices of pharmacists should be according to the regulations." *See United States v. Seelig*, 622 F.2d 207, 213 (6th Cir. 1980).  They did not opine on whether Jones did or did not have the requisite mens rea to violate § 841(a)(1). *See* Fed. R. Evid. 704(b).

The government provided sufficient evidence to support the jury's convictions on both the invalid-prescription counts and the pill-loaning counts. Jones's sufficiency-of-evidence claims therefore fail.

**III.**

Jones claims that the district court erred by allowing Taylor Carr, a former pharmacy technician at KHP, to offer an expert opinion in violation of Federal Rule of Evidence 701. At the time of Jones's trial, Carr was a first-year pharmacy student at the University of Kentucky; Jones complains that some of his testimony amounted to unqualified expert testimony.

The parties questioned Carr—a government witness—about his observations at KHP and whether those observations were consistent with what he had learned at pharmacy school. Carr testified that Jones frequently loaned pills to her regular customers. The government asked whether Carr had been concerned about the pill loaning:

> Q. [P]utting yourself in that situation as a pharmacy tech and just a person who lives in the area and has reasonable common sense, at the time, was there anything about [the pill loaning] that gave you concern?
>
> A. I mean, maybe, but I . . . hadn't been to pharmacy school, and this was my first pharmacy job, so I was -- just assumed that ...
>
> Q. Okay. Well, what about now?
>
> A. Now, yes, I realize that you can't do that.
>
> Q. Well, just, again, kind of drawing from your life's experience, if somebody walks in, and they ran out a few days earlier, let's say, of their hydrocodone, what's the big deal about giving them a new one?
>
> A. Now I know that it's a controlled substance, and you're not allowed to dispense a controlled substance like that. You have to be extra careful with them. And there are specific laws . . . that deal with, like, the monitoring of controlled substances.
>
> Q. But even then, back then as a pharmacy tech, if somebody ran out of their medication early, did you have any concerns about what might have happened to that medicine?

9

A. I can't remember any specific instances where I was worried.

R. 108, PageID: 1020–21.

Later, the government asked Carr to "reflect" on his observations at KHP, but Jones's attorney objected, arguing that the government had impermissibly solicited expert testimony. The government admitted that the question called for Carr's opinion but contended that any participant in a crime could "reflect" on his "life experiences" without giving an *expert* opinion. R. 108, PageID: 1033. Although the district court sustained Jones's objection, it instructed the government to ask whether the process at KHP was "consistent with what [Carr had] learned in pharmacy school." *Id.* After the colloquy with the court, however, the government decided to instead move on and ask Carr a different question altogether.

During cross-examination, the following exchange took place between Carr and Jones's attorney:

Q: Did you ever know Ms. Jones to ever tell somebody, "I'm not going to give you a prescription?"

A. I have seen that before, yes.

Q. Okay. Why wouldn't she give them a prescription?

A. I can, just off the top of my head for, if for weren't [sic], like, a customer there, she'd refused customers before.

Q. Okay. Well, you're a student, so let's -- all right. I realize you're in pharmacy school, but, you know, that person's got a prescription, some doctor wrote a prescription, and she won't give it to 'em? Did you ever ask her why not?

A. It was just my understanding that because they weren't already a patient.

Q. Okay. Now, you were talking a little bit about that occasionally they would loan people pills, correct?

A. Yes, sir.

> Q. Okay. And let's be clear: The people who would get those advance on pills or loans on pills, they already had prescriptions, correct?
>
> A. As far as I know, yes.
>
> Q. And I just want to be clear, it wasn't like somebody just came off the street and said, Give me ten oxycodone, I have no prescription; that wouldn't happen, would it?
>
> A. I don't recall ever seeing that happen.

R. 108, PageID: 1040–41.

The prosecutor approached the bench before redirect and argued that the defense had "opened the door" to Carr's opinion testimony as a pharmacy student. In defense, Jones's attorney said the question "really went to the loaning issue, that [KHP wasn't] just giving away pills." R. 108, PageID: 1042. But the government sought the court's permission to ask: "You're in pharmacy school. Is it enough just for a doctor [to write] a prescription?" *Id.* at 1044. Jones's attorney did not object, and the government asked Carr whether Jones's practice of pill loaning was consistent with what he had learned in pharmacy school:

> Q. You were asked a question as referenced to you being in pharmacy school, and there was a question about, Well, a doctor writes a prescription, and that's brought to the pharmacy. So you're in pharmacy school. Is it enough for a doctor to just write a prescription?
>
> A. No, sir.
>
> Q. Is there any doubt about that in your mind?
>
> A. Not from what I've been taught since I've been in pharmacy school.

R. 108, PageID: 1045.

Jones challenges the admission of Carr's redirect testimony, arguing that Carr was not qualified to opine on "whether it was legal to perform a certain pharmaceutical practice in a certain way based on his limited training in pharmacy school." Reply Br. at 10. And she contends that

Carr's testimony was especially prejudicial because he opined on the scope of professional practice while testifying as a fact witness who had worked at KHP.

We review for abuse of discretion a district court's evidentiary rulings on witness testimony. *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007).[4] "A court abuses its discretion when it 'relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard,' or when we are 'firmly convinced' that the trial court 'committed a clear error of judgment.'" *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015) (quoting *United States v. Miner*, 774 F.3d 336, 348 (6th Cir. 2014)). Even if we find that the district court abused its discretion, we reverse only if the erroneous admission of evidence affected the substantial rights of the party. *Id.*

A lay witness's opinions are limited to those which are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Jones's objection is based on the third limitation, which serves to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee's note (2000). To determine whether a lay witness impermissibly offered an expert opinion we look to the witness's reasoning: "lay testimony 'results from a process of reasoning familiar in everyday life,' whereas 'an expert's testimony results from a process of

---

[4] The government argues that we should review this claim for plain error because Jones did not reiterate her objection to Carr's testimony during redirect. But Jones's attorney objected to the question during the government's direct examination. And before redirect, Jones's attorney argued that he had not "opened the door" to Carr's opinion testimony. Under these circumstances, we find that Jones maintained a standing objection to Carr's testimony and decline to apply the plain-error standard of review. *See United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015) (declining to "parse out the challenged testimony that was not subject to objection at trial" because "the defendants maintained a standing objection throughout the trial to virtually all of the [witnesses'] testimony").

reasoning which can be mastered only by specialists in the field.'" *White*, 492 F.3d at 401 (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)).

Here, the district court did not abuse its discretion by admitting Carr's opinion testimony. First, a reasonable juror could not have mistaken Carr for an expert—Carr testified that he had completed only one semester of pharmacy school. We therefore cannot characterize Carr as "an expert in lay witness clothing." *See* Fed. R. Evid. 701 advisory committee's note (2000). Second, Carr reached his opinion using "a process of reasoning familiar in everyday life" rather than "reasoning which can be mastered only by specialists in the field." *See White*, 492 F.3d at 401 (quoting *Brown*, 836 S.W.2d at 549). He testified that his short time in pharmacy school only confirmed what he "maybe" already knew as a pharmacy technician: that it is not "enough for a doctor to just write a prescription." R. 108, PageID: 1020, 1045. Carr might have impermissibly veered into expert-opinion territory if, for example, he had defined an ambiguous term, *cf. United States v. Cruz*, 363 F.3d 187, 195–97 (2d Cir. 2004), or explained a technical concept, *cf. White*, 492 F.3d at 403–04. But we cannot say Carr's testimony was based on anything beyond his everyday life experience, such as "scientific, technical, or other specialized knowledge." *See* Fed. R. Evid. 701(c). Indeed, another pharmacy technician at KHP—April Bryant—did not require a semester of pharmacy school to understand that "you're not supposed to give out medications without a prescription." R. 109, PageID: 1071. Jones's claim therefore fails.

**IV.**

For the foregoing reasons, we **AFFIRM** Jones's convictions.